# NEW YORK ET AL. *v.* UNITED STATES ET AL.

NO. 343.

Argued March 3, 4, 5, 1947.—Decided May 12, 1947.

*Parker McCollester* argued the cause for appellants in No. 343. With him on the brief were *Kenneth L. Sater* for the appellant States, *Nathaniel L. Goldstein,* Attorney General, and *Frank J. Clark* for the State of New York, *Clair John Killoran,* Attorney General, for the State of Delaware, *James A. Emmert,* Attorney General, and *Karl J. Stipher,* Deputy Attorney General, for the State of Indiana, *Hall Hammond,* Attorney General, for the State of Maryland, *Foss O. Eldere,* Attorney General, and *James W. Williams,* Assistant Attorney General, for the State of Michigan, *Walter D. Van Riper,* Attorney General, and *Robert Peacock,* Deputy Attorney General, for the State of New Jersey, *Hugh S. Jenkins,* Attorney General, for the State of Ohio, *John E. Martin,* Attorney General, and *Herbert T. Ferguson,* Assistant Attorney General, for the State of Wisconsin, and *James H. Duff,* Attorney General, and *E. A. DeLaney,* Deputy Attorney General, for the Commonwealth of Pennsylvania.

*Henry F. Foley* argued the cause and filed a brief for appellants in No. 344.

*Douglas F. Smith* argued the cause for appellants in No. 345. With him on the brief were *H. C. Barron, C. W. Fiddes, H. E. Boe, P. F. Gault, G. H. Muckley, Elmer B. Collins, Carson L. Taylor, Robert Thompson* and *D. Robert Thomas.*

*Edward H. Miller* argued the cause for the United States and *Daniel W. Knowlton* argued the cause for the Interstate Commerce Commission, appellees. With

them on the brief were *Acting Solicitor General Washington* and *Assistant Attorney General Berge.*

*J. V. Norman* argued the cause for the Southern States and Southern Governors' Conference, appellees.

*Byron M. Gray* argued the cause for the State of Arkansas et al., appellees. With him on the brief were *J. C. Murray* for the State of Arkansas, *Walter R. Johnson,* Attorney General, and *H. Emerson Kokjer,* Deputy Attorney General, for the State of Nebraska, *Nels G. Johnson,* Attorney General, *Neal E. Williams* and *James Hanley* for the State of North Dakota, *C. B. Bee* for the State of Oklahoma, *William Williamson,* Assistant Attorney General, for the State of South Dakota, and *Price Daniel,* Attorney General, *James D. Smullen* and *Charles D. Methews,* Assistant Attorneys General, for the State of Texas.

*J. A. A. Burnquist,* Attorney General, and *George T. Simpson* filed a brief for the State of Minnesota, appellee.

*Eldon S. Dummit,* Attorney General, *M. B. Holifield,* Assistant Atorney General, *J. E. Marks* and *L. F. Orr* filed a brief on behalf of the State of Kentucky, as *amicus curiae,* urging affirmance.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BURTON.

The orders of the Interstate Commerce Commission, which appellants seek to have set aside, resulted from two separate investigations instituted by the Commission on its own motion in 1939 to inquire into the lawfulness or unlawfulness of most of the then existing rate-making standards for interstate railroad class freight rates in the United States. One investigation related to classifica-

tions[1] under which commodities move by rail freight. The other related to class rates.[2] The two investigations were consolidated and were covered by one report, as the problems of classification and of class rates[3] are closely interrelated. The findings of the Commission as to classifications are not directly involved here. For the orders of the Commission under attack are interim orders which affect only class rates, increasing them in some areas and decreasing them in others. But a review and summary of the Commission's findings both on classifications and

[1] Commodities are grouped into classes, those commodities in each class paying the same freight rate per 100 pounds. Frequently a commodity is in several classes depending upon whether carload or less-than-carload lots are involved, and upon the method of packaging. One class is called first-class or class 100 and each other class has been fixed as a percentage, or multiple, of first-class. Thus the freight *classifications* involved in these cases consist of lists containing descriptions of every commodity moving by freight and the class or classes to which it is assigned, *i. e.*, its *classification rating* or *ratings*. See 262 I. C. C. pp. 465–472.

[2] The *class rates* are in the form of a schedule which shows the price per 100 pounds for moving first-class freight every possible distance it may be moved. The cost of shipment for a given commodity is determined by ascertaining its classification rating, the first-class rate per 100 pounds for the haul involved, and the percentage of the first-class rate to which the classification rating in question is subject. See 262 I. C. C. pp. 515–519.

[3] There are three other kinds of rates:

*Exception* rates are rates resulting from the transfer of a commodity out of its regularly assigned class in the classification and into another class.

*Commodity* rates are special rates established for particular commodities. For purposes of these rates a commodity is not given a classification rating; the result is that the commodity rates have no fixed percentage relationships to first-class rates.

*Column* rates are fixed as definite percentages of first-class rates but like commodity rates they apply only to particular commodities and are assigned no regular class.

See 262 I. C. C. p. 562.

on class rates are essential for an understanding of the problem.

While there are three major classification territories, there are five major rate territories.[4]   Official Territory, roughly speaking, lies east of the Mississippi and north of the Ohio and Potomac Rivers; it also includes most of Virginia.   Southern Territory lies south of Official Territory and east of the Mississippi.   Western Trunk-Line Territory is located approximately between Official Territory and the Rocky Mountains.   Southwestern Territory lies south of Western Trunk-Line Territory and west of the Mississippi and includes Arkansas, Texas, Oklahoma, and part of Louisiana.   Mountain-Pacific Territory includes Montana and New Mexico and all territory west of the Rockies.   Only Mountain-Pacific Territory is not involved in these cases.

The three major classifications are Official, Southern and Western.[5]   But there is great lack of uniformity in the classifications.   The problem is one with which the Commission has long wrestled.[6]   But prior to the present

[4] Some rate territories have subdivisions in which rate differentials are applicable which vary the class rates within the territory in question.

[5] The Official Classification applies within Official Territory and from Western Trunk-Line Territory to Official.   The Southern Classification applies within Southern Territory, between Official and Southern, and from Western Trunk-Line to Southern.   Western Classification includes Western Trunk-Line, Southwestern and Mountain Pacific rate territories.   It applies within those three territories, between Southwestern and Official, between Southwestern and Southern, from Official to Western Trunk-Line, between Mountain Pacific and Official, from Southern to Western Trunk-Line, and between Mountain-Pacific and Southern.

[6] *Western Classification,* 25 I. C. C. 442; *Consolidated Classification,* 54 I. C. C. 1; *Southern Class Rate Investigation,* 100 I. C. C. 513; *Consolidated Southwestern Cases,* 123 I. C. C. 203; *Western Trunk-Line Class Rates,* 164 I. C. C. 1; *Eastern Class-Rate Investigation,* 164 I. C. C. 314.

investigation its chief accomplishment in this field had been to establish classification uniformity within the separate territories. National classification uniformity was still in the main lacking. Many differences between classifications on a particular rating are matters of substance; others are matters of nomenclature. Moreover, there has been a tendency among carriers to work against the evolution of uniform classifications by making exceptions which remove commodities from the classifications for rate-making purposes.

Section 1 (4) of the Interstate Commerce Act as amended, 24 Stat. 379, 54 Stat. 899, 900, 49 U. S. C. § 1 (4) provides that it shall be the duty of common carriers to establish just and reasonable classifications applicable to through freight rates and charges. Section 1 (6) prohibits every unjust and unreasonable classification. Section 3 (1) prohibits discrimination. And § 15 (1) empowers the Commission to prescribe just, fair, and reasonable classifications, after a finding that existing classifications are unlawful. The Commission found that the existing classifications are unlawful and will continue to be unlawful until there is national uniformity of classification. It found that differences in the applicable classifications affect the levels of the class rates as much as or more, in some instances, than the differences in the levels of the class rate scales themselves. It found that shippers in one territory pay more than shippers in another territory on the same article because of classification differences; that territorial boundaries separating classification territories are artificial and cause serious complications; that where geographic conditions produce divergent costs, revenue requirements, or other conditions requiring rate adjustments, the adjustments should be made not in the basic classification itself but in the rate levels or by the creation of legitimate exceptions to the classification; that amongst the classifications there was no real uniformity

of classification ratings although the same classification principles are applicable throughout the nation. It concluded that without such uniformity it is impossible to maintain just and reasonable relationships between class rates for competing commodities; that it is feasible for the carriers to establish a uniform classification. The Commission gave the railroads the opportunity to take the initiative in preparing the new uniform classification—an invitation which, we are advised, has been accepted.

Prior to this proceeding the Commission made four major class rate investigations—one for each of the rate territories except Mountain-Pacific.[7] These established class rate structures on a regional basis, *i. e.* they established some degree of uniformity in class rates within each territory or subdivision of a territory. But they did not deal with interterritorial class rates by harmonizing regional rate adjustments one with the other. As a result there are separate interterritorial rate structures applicable to freight traffic moving from one territory into another.

These territorial class rate structures are exceedingly complicated. There is no basic uniformity amongst them and they are computed by varying formulae.

The Commission found that class rates within Southern, Southwestern and Western Trunk-Line territories, and from those territories to Official Territory, were generally much higher, article for article, than the rates within Official Territory. It found that higher class rates have impeded the development and movement of class rate

---

[7] *Eastern Class-Rate Investigation,* 164 I. C. C. 314, 171 I. C. C. 481, 177 I. C. C. 156, 203 I. C. C. 357; *Southern Class Rate Investigation,* 100 I. C. C. 513, 109 I. C. C. 300, 113 I. C. C. 200, 128 I. C. C. 567; *Western Trunk-Line Class Rates,* 164 I. C. C. 1, 173 I. C. C. 637, 178 I. C. C. 619, 181 I. C. C. 301, 196 I. C. C. 494, 197 I. C. C. 57, 204 I. C. C. 595, 210 I. C. C. 312, 246 I. C. C. 119; *Consolidated Southwestern Cases,* 123 I. C. C. 203, 205 I. C. C. 601. See the discussion in 262 I. C. C. pp. 526 *et seq.*

freight within Southern, Southwestern and Western Trunk-Line territories and from those territories to Official Territory. It concluded that neither the comparative costs of transportation service nor variations in the consists [8] and volume of traffic within the territories justified those differences in the class rates. The Commission also determined that equalization of class rates is not dependent on equalization of non-class rates and that interterritorial rate problems can be solved only by establishing substantial uniformity in class ratings and rates.

Section 1 (4) and (5) (a) of the Act require rates and charges to be just and reasonable. The Commission found that the intraterritorial class rates applicable to the territories in question and the interterritorial class rates between the territories violate those provisions.

Section 3 (1) of the Act outlaws undue or unreasonable preferences or advantages to any region, district, or territory. The Commission found that the relation between the interterritorial class rates to Official Territory from the other territories in question and the intraterritorial class rates within Official Territory results in an unreasonable preference to Official Territory as a whole, and to shippers and receivers of freight located there, in violation of § 3 (1). The Commission, acting pursuant to its authority under § 15 (1) of the Act, prescribed reasonable and nondiscriminatory class rates to cure the preference found to exist, the new rates to become applicable simultaneously with the new revised classification which, as we have noted, the Commission ordered to be established.

But time will be required to formulate a uniform classification. And the Commission concluded that pending completion of that undertaking certain interim readjustments in the existing basis of class rates, based on existing

---

[8] The consist of freight in a given territory is the totality of commodities carried in that territory.

classifications, could be made—readjustments which would be just and reasonable, and which would reduce to a minimum the preferences and prejudices which the Commission found to be unlawful in the existing system. It determined that the several intraterritorial freight-rate structures should be brought closer to the same level and be constructed on the same pattern or scheme. It concluded that as many differences as possible between the interterritorial rates and the intraterritorial rates should be eliminated. It accordingly ordered that existing interstate class rates [9] applicable to freight traffic moving at the classification ratings within Southern, Southwestern, and Western Trunk-Line territories, interterritorially between those territories, and interterritorially between each of those territories and Official Territory, be reduced 10 per cent subject to qualifications not important here. It also ordered that interstate class rates for freight traffic moving at classification ratings within Official Territory be increased 10 per cent, subject to qualifications not relevant to our problem. It found the new interim class rates just and reasonable. 262 I. C. C. 447, supplemental report, 264 I. C. C. 41.

The new interim rates were ordered to become effective January 1, 1946. Prior to that date, New York and other northern States, appellants in No. 343, filed their petition in the District Court to set aside the orders of the Commission. A statutory three judge court was convened and a temporary injunction was issued preventing the orders from going into effect. 38 Stat. 208, 220, 28 U. S. C. § 47. The Governors of the six New England States (three of whose successors in office have been substituted as appellants in No. 344) intervened on the side of the plaintiffs, as did most of the appellants in

---

[9] No change in intrastate class rates was made. Nor was any change made in existing exception, column or commodity rates. See note 3, *supra.*

No. 345. The Commission and others [10] intervened on the side of the United States. Appellants in No. 345, including most of the western railroads, also filed their petition in the District Court seeking substantially the same relief as appellants in No. 343. The cases were consolidated and tried together, the District Court receiving additional evidence offered by the western railroads. The court sustained the orders of the Commission in all respects, 65 F. Supp. 856, but continued the injunction pending appeal to this Court.[11] Judicial Code § 210, 28 U. S. C. § 47a.

*First.* The principal evil at which the Interstate Commerce Act was aimed was discrimination in its various manifestations. *Louisville & N. R. Co.* v. *United States,* 282 U. S. 740, 749–750. Until 1935, § 3 (1) of the Act prohibited discrimination only against a "person, company, firm, corporation, or locality, or any particular description of traffic . . . ." 24 Stat. 379, 380. The question arose whether "locality" included a port insofar as the port was not a point of origin or destination but a gateway through which shipments were made. The Court held by a closely divided vote, and contrary to the ruling of the Commission, that it did not. *Texas & Pacific R. Co.* v. *United States,* 289 U. S. 627. Thereafter Congress amended § 3 (1) so as to extend the prohibition against discrimination to include a "port, port district, gateway, transit point." 49 Stat. 607. And see *Albany Port Dis-*

---

[10] Alabama, Arkansas, Florida, Georgia, Kansas, Louisiana, Mississippi, Minnesota, Nebraska, North Carolina, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, the State Commissions of a number of these States, the Southern Governors' Conference, and the Southeastern Association of Railroad and Utilities Commissioners.

[11] We denied the motion of the United States to dissolve the injunction. 328 U. S. 824. See Fed. R. Civ. P. 62 (g).

*trict Commission* v. *Ahnapee & W. R. Co.*, 219 I. C. C. 151. That was in 1935. In 1940 Congress went further. By § 5 (b) of the Transportation Act of 1940, 54 Stat. 899, 902, known as the Ramspeck Resolution, it authorized and directed the Commission to institute an investigation into rates on commodities between points in one classification territory and points in another territory and into like rates within territories for the purpose of determining whether those rates were "unjust and unreasonable or unlawful in any other respect in and of themselves or in their relation to each other, and to enter such orders as may be appropriate for the removal of any unlawfulness which may be found to exist . . . ." [12] Congress also extended the prohibition against discriminations by adding to § 3 (1) the words "region, district, territory." [13]

It is now asserted that the Commission has misunderstood its duties under these 1940 amendments. It is said that the Commission has construed this mandate of Congress to mean that identical rates, mile for mile, should be

[12] The Commission advised Congress that its investigations instituted in 1939 (the basis of the orders challenged in the present cases) would be carried out pursuant to this mandate. See 262 I. C. C. p. 689.

[13] Section 3 (1) now reads:

"It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however*, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

established everywhere in the country, in face of a long-standing practice of rate-making (which the legislative history of the 1940 amendments shows was not intended to be changed) that allowed differences in rates which were based on differences in the length of haul, character of the terrain, density of traffic, and other elements of the cost of service. Thus it is argued that the Commission runs afoul of *Ann Arbor R. Co.* v. *United States*, 281 U. S. 658, which involved the construction of a joint resolution of Congress directing the Commission to make an investigation to determine whether existing rates and charges were unjust, unreasonable, or unjustly discriminatory so as to give undue advantage "as between the various localities and parts of the country . . . ." 43 Stat. 801, 802. The Commission, relying on that mandate, condemned certain existing rates between California and eastern points. The Court set aside the order of the Commission, holding that the joint resolution did not purport to change the existing law but left the validity of rates to be determined by that law.

But the Commission in the present cases did not proceed on the assumption that the Ramspeck Resolution changed the substantive law. As we read its report, the Commission took the resolution only as a directive to investigate and correct violations of substantive law as it deemed that law broadened by the amendment to § 3 (1). It said:

"By the amendment to the substantive antidiscrimination provisions of section 3 (1) all discriminations in the form of undue or unreasonable preference or advantage, or undue or unreasonable prejudice or disadvantage, as between regions, districts, or territories, viewed as separate entities, were brought directly within the purview of the act along with all the other inhibitions previously included. We were then authorized and directed by the other provisions men-

tioned to remove any such discriminations found to exist in a proper proceeding. This means that such discriminations as those mentioned which result from differences in the methods of distributing the general rate burden in the several rate-making territories, or from any other cause, if not justified upon proper consideration of recognized elements of rate making applied in the light of the amended law are unlawful and should be corrected." 262 I. C. C. p. 692.

From this statement it is apparent that the Commission concluded that the 1940 amendment to § 3 (1) enlarged the scope of the section. The Commission, indeed, stated that "it is clear that the main purpose which Congress had in mind was to bring about a greater degree of equalization, harmony, and uniformity in the different regional or territorial rate structures of the country." *Id.* p. 692. And see *id.* pp. 688–691. But it is suggested that discriminations based on geographic factors were outlawed prior to the 1940 amendment to § 3 (1), as evidenced by its long-standing condemnation of "undue or unreasonable prejudice or disadvantage" to any "locality" and, since 1935, to any "port, port district, gateway, transit point." [14] It is, moreover, suggested that even the prohibition of discriminations against shippers was broad enough all along to ban discriminations based on the geographic location of the shippers. The contention is that without a change in the law the present orders were unwarranted; it is pointed out that the class rates now condemned had been found by the Commission itself to be just and reasonable in recent years. And it is asserted

---

[14] It is pointed out in this connection that *Texas & Pacific R. Co.* v. *United States, supra,* while holding that a port was not a "locality" when it was only a gateway through which shipments were made, recognized that a port was a "locality" when it was a point of origin or destination. 289 U. S. p. 638.

that the Commission did not take its present action on a showing of changed circumstances since those times. The conclusion, therefore, is that the present orders are not warranted by § 3 (1).

. We need not determine whether, prior to the 1940 amendment, § 3 (1), by its ban on unlawful discriminations against a "locality," would have permitted the Commission to eradicate regional discriminations in class rates. For whatever doubt may have existed in the law was removed by the 1940 amendment which made abundantly clear that Congress thought that the problem of regional discriminations had been neglected and that, if any such discriminations were found to. be present, they should be eradicated.[15] But, as the Commission concedes, the addition of "region, district, territory" to § 3 (1) did not change the law respecting discrimination by authorizing uniform freight rates, mile for mile, without regard to differing costs of the service. Congress, by adding those words, made plain the duty of the Commission, in determining whether discriminatory practices exist, to consider the interests of regions, districts, and territories, and to eliminate territorial rate differences which are not justified by differences in territorial conditions. In other words Congress did not introduce a new standard of discrimination by its amendment to § 3 (1); it merely made clear its purpose that regions, districts, and territories should be the beneficiaries of the law against discrimination.

---

[15] Senator Wheeler who had charge of the bill on the floor of the Senate stated concerning the amendment to § 3 (1): "The previous provision with regard to 'discrimination' simply referred to discrimination as to 'locality, port, port district, gateway, transit point' without specifying the region, district, or territory. So we felt that by broadening the language we would at least take away that excuse, and we would provide expressly that the Commission should not discriminate in its rate structures." 84 Cong. Rec., p. 5889.

*Second.* It is argued, however, that the findings of the Commission concerning regional discriminations in class rates are not supported by substantial evidence.

The great differences betwen territorial class rate levels are shown by the following table. It gives a comparison (in cents per 100 pounds) between the first-class rate scale within Official Territory and that within each of the other territories:

| Distance | Eastern scale rate | Southern scale | | Western trunk-line scale | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Zone I | | Zone II | | Zone III | |
| | | Rate | Percentage of Eastern | Rate | Percentage of Eastern | Rate | Percentage of Eastern | Rate | Percentage of Eastern |
| 50 miles | 47 | 57 | -------- | 53 | -------- | 61 | -------- | 65 | -------- |
| 100 miles | 62 | 79 | -------- | 73 | -------- | 83 | -------- | 90 | -------- |
| 150 miles | 73 | 96 | -------- | 86 | -------- | 98 | -------- | 107 | -------- |
| 200 miles | 80 | 112 | -------- | 97 | -------- | 111 | -------- | 123 | -------- |
| 300 miles | 96 | 134 | -------- | 117 | -------- | 134 | -------- | 147 | -------- |
| 400 miles | 109 | 156 | -------- | 136 | -------- | 156 | -------- | 172 | -------- |
| 500 miles | 122 | 173 | -------- | 156 | -------- | 178 | -------- | 196 | -------- |
| 600 miles | 135 | 189 | -------- | 176 | -------- | 200 | -------- | 220 | -------- |
| 700 miles | 149 | 206 | -------- | 196 | -------- | 222 | -------- | 244 | -------- |
| 800 miles | 160 | 222 | -------- | 210 | -------- | 239 | -------- | 263 | -------- |
| 900 miles | 171 | 235 | -------- | 226 | -------- | 256 | -------- | 282 | -------- |
| 1,000 miles | 182 | 249 | -------- | 240 | -------- | 273 | -------- | 300 | -------- |
| Average | -------- | ------ | 137.7 | ------ | 129.6 | ------ | 144.4 | ------ | 159.4 |

These first-class intraterritorial rates are used as bases in formulating rates on other classes of freight in the respective territories.[16]

The following tables compiled by Government counsel show the first-class rates for interterritorial movements to Official Territory from each of the other territories as compared with intraterritorial movements for approximately equal distances within Official Territory:

---

[16] See note 2, *supra.*

| Southern v. Official | | Miles | First class rates | Disadvantage of Southern Territory shipper compared with Official Territory shipper | |
|---|---|---|---|---|---|
| From— | To— | | | In cents | In per cent |
| Nashville, Tenn | Indianapolis, Ind | 297 | 135 | | |
| Indianapolis, Ind | Kent, Ohio | 296 | 96 | 39 | 41 |
| Knoxville, Tenn | Columbus, Ohio | 395 | 155 | | |
| Baltimore, Md | Warren, Ohio | 392 | 103 | 52 | 50 |
| Birmingham, Ala | Muncie, Ind | 536 | 179 | | |
| Pittsburgh, Pa | Rockford, Ill | 538 | 128 | 51 | 40 |
| Chattanooga, Tenn | Chicago, Ill | 594 | 187 | | |
| Philadelphia, Pa | Toledo, Ohio | 595 | 135 | 52 | 39 |
| Atlanta, Ga | Chicago, Ill | 731 | 210 | | |
| Danville, Ill | Washington, D. C | 733 | 151 | 59 | 39 |
| Macon, Ga | Chicago, Ill | 819 | 223 | | |
| Trenton, N. J | Danville, Ill | 819 | 163 | 60 | 37 |

| Southwestern v. Official | | Miles | First class rates | Disadvantage of Southwestern Territory shipper compared with Official territory shipper | |
|---|---|---|---|---|---|
| From— | To— | | | In cents | In per cent |
| Little Rock, Ark | Detroit, Mich | 785 | 222 | | |
| Official Territory Point | Detroit, Mich | 785 | 160 | 62 | 39 |
| Oklahoma City, Okla | Cincinnati, Ohio | 882 | 244 | | |
| Official Territory Point | Cincinnati, Ohio | 882 | 171 | 73 | 43 |
| Shreveport, La | Cleveland, Ohio | 1,013 | 264 | | |
| Official Territory Point | Cleveland, Ohio | 1,013 | 185 | 79 | 43 |
| Dallas, Tex | Pittsburgh, Pa | 1,224 | 304 | | |
| Official Territory Point | Pittsburgh, Pa | 1,224 | 207 | 97 | 47 |

| Western Trunk-Line v. Official | | Miles | First class rates | Disadvantage of Western Trunk-Line Territory shipper compared with Official Territory shipper | |
|---|---|---|---|---|---|
| From— | To— | | | In cents | In per cent |
| Des Moines, Iowa_____ | Toledo, Ohio_____ | 558 | 142 | _____ | _____ |
| Official Territory Point_____ | Toledo, Ohio_____ | 558 | 118 | 24 | 20 |
| St. Paul, Minn_____ | South Bend, Ind_____ | 491 | 138 | _____ | _____ |
| Official Territory Point_____ | South Bend, Ind_____ | 491 | 111 | 27 | 24 |
| Lincoln, Nebr_____ | Evansville, Ind_____ | 612 | 169 | _____ | _____ |
| Official Territory Point_____ | Evansville, Ind_____ | 612 | 125 | 44 | 35 |
| Denver, Colo_____ | Cleveland, Ohio_____ | 1,329 | 289 | _____ | _____ |
| Official Territory Point_____ | Cleveland, Ohio_____ | 1,329 | 200 | 89 | 45 |

The disadvantage to the Southern or Western shipper who attempts to market his product in Official Territory is obvious. Thus the first of these tables shows that a Nashville shipper pays 39 cents more on each 100 pounds of freight moving to Indianapolis, Indiana than one who ships from Indianapolis to a point of substantially equal distance away (Kent, Ohio) in Official Territory. Similar disadvantages suffered by Southern and Western shippers are revealed in the other comparable interterritorial freight movements set forth in the tables.

That disadvantage is emphasized if the effects of classification differences on rates for identical commodities are considered. A comparison of rates in cents per 100 pounds for 200 miles shows that, even though shippers in the South and West have the same or lower classification ratings for identical commodities, they nevertheless *on the whole* pay higher charges than the shippers in Official Territory for equivalent service. Thus there are in class 100 (first class) for less-than-carload lots 2092 items

common to the three classifications. In Official Classification all of these move at a rate of 80 cents per 100 pounds for a haul of 200 miles. In Southern, 2075 of these items are classified 100 and move at a rate of $1.12. Of the remaining 17 items 5 are classified in Southern in class 85 with a rate of 95, 2 in class 70 with a rate of 78, 7 in class 55 with a rate of 62, 2 in class 45, with a rate of 50, 1 in class 40 with a rate of 45. In Western Trunk-Line Zone I, 2076 of the 2092 items are classified 100 with a rate of 97, 4 in 85 with a rate of 82, 10 in 70 with a rate of 68, 2 in 55 with a rate of 53.

In class 100 for carload lots there are 213 common items. In Official Classification all of these move at a rate of 80 cents for a haul of 200 miles. In Southern, 199 of these items are classified 100 and move at a rate of $1.12 for 200 miles. Of the remaining 14, 7 are classified in Southern in class 85 with a rate of 95, 2 in 75 with a rate of 84, 5 in 70 with a rate of 78. In Western Trunk-Line Zone I, 202 of the 213 items are classified 100 with a rate of 97, 7 in 85 with a rate of 82, 3 in 70 with a rate of 68, 1 in 55 with a rate of 53. Additional illustrations are too numerous and detailed to include in this opinion. But the ones given are representative of the rest and show how disparities in the rate levels are aggravated when the effects of classification differences on rates are considered.

There is rather voluminous evidence in the record tendered to show the effect in concrete competitive situations of these class rate inequalities. The instances were in the main reviewed by the Commission. They are attacked here on various grounds—that some of them involved rates other than class rates, that others were testified to by shippers who made no complaint of class rates, that others showed shippers paying higher rates yet maintaining their competitive positions and prospering. We do not stop to

analyze them or discuss them beyond saying that some of the specific instances support what is plainly to be inferred from the figures we have summarized—that class rates within Southern, Southwestern and Western territories, and from those territories to Official Territory, are generally much higher, article for article, than the rates within Official Territory. That was the basic finding of the Commission; and it is abundantly supported by the evidence.

Thus discrimination in class rates in favor of Official Territory and against the Southern, Southwestern and Western Trunk Line territories is established. But that is not the end of the matter. For "mere discrimination does not render a rate illegal under § 3." *United States* v. *Illinois Central R. Co.*, 263 U. S. 515, 521. Section 3 condemns "any undue or unreasonable preference or advantage" and "any undue or unreasonable prejudice or disadvantage" to any territory. And, as we have said, the 1940 amendment to § 3, by its addition of "region, district, territory," did not change the prevailing rules respecting unlawful discrimination; it merely enlarged the reach of § 3. Hence we must determine from the pre-existing law whether a discrimination against a territory is obnoxious to § 3. The rule is stated in *United States* v. *Illinois Central R. Co.; supra*, p. 524, as follows:

> "To bring a difference in rates within the prohibition of § 3, it must be shown that the discrimination practiced is unjust when measured by the transportation standard. In other words, the difference in rates cannot be held illegal, unless it is shown that it is not justified by the cost of the respective services, by their values, or by other transportation conditions."

It is on this principle that the findings of the Commission under § 3 are both defended and attacked.

*Third.* The Commission's findings under § 3 (1) are first challenged on the ground that there is no finding that the corresponding class rates are actually charged to or demanded of competing shippers in the several territories. That is to say, no unlawful discrimination in favor of a shipper in Official Territory and against a shipper in Southern Territory can be said to exist unless it is shown that the southern competitor is actually required to pay the higher interterritorial class rates. It is contended that the record negatives the existence of facts which could support such a finding and that no such finding was made. Reliance is placed on two circumstances. In the first place, reference is made to the effect of classification ratings on class rates which we briefly summarized above. It is noted, for example, that the southern shipper in some instances actually pays less for the shipment of the same commodity than the shipper in Official Territory, *e. g.,* where the Southern Classification carries the commodity in a lower class, which in turn exacts a rate less than that required of the higher classification granted by Official. It is apparent from the illustrations we have given that such is true in some cases. But that is not the dominant pattern. In the vast majority of the instances the classification ratings, like the class rate structure, work to the benefit of Official Territory and against the others. But the greater reliance is placed on the second circumstance— that only a minor portion of freight moves by class rates and of that a greater percentage moves in Official Territory than in the others. This point requires a more extended answer.

The Commission, indeed, found that by reason of nonuse the class rates have become obsolete and no longer serve the purposes for which they were designed. They move a relatively small amount of freight. The following table indicates the percentages of carload traffic carried at class rates within and between territories in 1942:

| From | To | | | |
|------|---------|----------|-------------------|-----------------------|
| | Official | Southern | South-western | Western trunk-line |
| Official | 5.8 | 12.6 | 22.5 | 12.3 |
| Southern | .9 | 1.8 | 6.1 | 1.5 |
| Southwestern | 1.5 | 1.2 | 2.4 | 2.0 |
| Western trunk-line | 3.1 | 6.1 | 13.0 | .6 |

In September, 1940, for example, less-than-carload ratings on about 3,000 commodities were removed from the Southern Classification by classification exceptions. The great bulk of the freight moves on exception rates and commodity rates.[17] This trend, according to the Commission, has been the result of competitive forces. The creation of the exceptions has "shorn the ratings in the classifications of much of their usefulness and proper function." 262 I. C. C. p. 504. The record is replete with evidence supporting this finding of the Commission. And appellants seize on it as supporting their claim that since class rates have largely become paper rates, they are not the source of injury to shippers from the South and the West; that if the latter are prejudiced by the rate structure, the injury must flow from the exception rates and commodity rates not involved in this proceeding; and that in any event the case of unlawful discriminations in favor of Official Territory and against the other territories has not been founded on the actual use of disadvantageous class rates by shippers in the Southern, Southwestern, and Western Trunk-Line territories.

But that takes too narrow a view of the problem confronting the Commission. We start of course with some showing of actual discrimination against shippers by reason of their use of class rates. But the main case of discrimination made out by the record is one against

---

[17] See note 3, *supra*.

regions and territories. We assume that a case of unlawful discrimination against shippers by reason of their geographic location would be an unlawful discrimination against the regions where the shipments originate. But an unlawful discrimination against regions or territories is not dependent on such a showing. As we stated in *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 450, "Discriminatory rates are but one form of trade barriers." Their effect is not only to impede established industries but to prevent the establishment of new ones, to arrest the development of a State or region, to make it difficult for an agricultural economy to evolve into an industrial one. Non-discriminatory class rates remove that barrier by offering that equality which the law was designed to afford. They insure prospective shippers not only that the rates are just and reasonable *per se* but that they are properly related to those of their competitors. Shippers are then not dependent on their ability to get exception rates or commodity rates after their industries are established and their shipments are ready to move. They have a basis for planning ahead by relying on a coherent rate structure reflecting competitive factors.

If a showing of discrimination against a territory or region were dependent on a showing of actual discrimination against shippers located in these sections, the case could never be made out where discriminatory rates had proved to be such effective trade barriers as to prevent the establishment of industries in those outlying regions. If that were the test, then the 1940 amendment to § 3 (1) would not have achieved its purpose. We cannot attribute such futility to the effort made by Congress to make regions, districts and territories, as well as shippers, the beneficiaries of its anti-discrimination policy expressed in § 3 (1).

So far as the remedy is concerned, the present cases might, of course, be different if the Commission had no power to prescribe classifications. But § 15 (1) of the Act grants it full power, on finding that a classification is "unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial," to determine and prescribe what classification will be "just, fair, and reasonable." The Commission's over-all conclusion was that the classifications in force and the class rates computed from them harbor inequities which result in unlawful discriminations in favor of Official Territory and against the other territories. The fact that relatively small amounts of freight move by class rates proves not that the regional and territorial discrimination is slight, but that the rate structure as constituted holds no promise of affording the various regions or territories that parity of treatment which territorial conditions warrant. The Commission in substance concluded that that result could not be achieved unless traffic was, in the main, moved on class rates. We will discuss later the appropriateness of the relief granted by the interim orders here challenged. It is sufficient here to note that the case of unlawful discrimination against these territories was chiefly founded on the absence of non-discriminatory class rates and uniform classifications which would remove the features of existing rate structures prejudicial to Southern, Southwestern, and Western Trunk-Line territories.

We are thus not primarily concerned with the adequacies of the Commission's findings showing discrimination against actual shippers located in a territory (cf. *Florida* v. *United States,* 282 U. S. 194; *North Carolina* v. *United States,* 325 U. S. 507; *Interstate Commerce Commission* v. *Mechling,* 330 U. S. 567), but with prejudice to a territory as a whole.

*Fourth.* The inquiry of the Commission into the effect of class rates on the economic development of Southern, Southwestern, and Western Trunk-Line territories took a wide range. It concluded that prejudice to the territories in question had been established. We think that finding is supported by substantial evidence.

It is, of course, obvious that the causal connection between rate discrimination and territorial injury is not always susceptible of conclusive proof. The extent of that causal relation cannot in any case be shown with mathematical exactness. It is a matter of inference from relevant data. The Commission recognized, for example, that the fact that the South has fewer industries than the East results from a complex of causes—that the "industrial development of the East is due to many factors other than transportation services and costs, such as climate, soil, natural resources, available water power, supplies of natural gas and coal, and early settlements of population which antedated the building of railroads." 262 I. C. C. p. 619. It noted that in 1939 freight revenues on commodities in the manufactures and miscellaneous group were but 5.3 per cent of the destination value of manufactured goods and that differences in freight charges resulting from differences in class rate levels were only a small fraction of that figure. But it nevertheless concluded that "Nearness to markets and ability to ship to markets, on a basis fairly and reasonably related to the rates of competitors, are nevertheless potent factors in the location of a manufacturing plant. In fact, rate relations are more important to the manufacturer and shipper than the levels of the rates." 262 I. C. C. 619–620.

The great advance in industrialization of Official Territory over the other territories need not be labored, for it is obvious. Some manifestations of that development may be illustrated by the following tables:

| Territory | Land area, 1940 | Gainful workers, 1930 | Value of manufactured products, 1939 | Value added by manu- facture, 1939 |
|---|---|---|---|---|
| Official | 13.5 | 51.1 | 67.8 | 71.4 |
| Southern | 13.3 | 16.8 | 10.0 | 9.4 |
| Western Trunk Line | 20.9 | 13.5 | 9.9 | 8.7 |
| Southwestern | 14.2 | 9.3 | 4.5 | 3.3 |
| Mountain Pacific | 38.1 | 9.3 | 7.8 | 7.2 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 |

Another measure of industrial growth is shown by the number of gainful workers and the manufacturing industries in the several territories:

| Territory | Actual increase in total gainful workers from 1910 to 1930 | Actual increase in value of products in all manufacturing industries from 1909 to 1939 | Actual increase in value added by manufacture in all manufac- turing industries from 1909 to 1939 |
|---|---|---|---|
| Official | 6,230,273 | $23,561,190,000 | $11,284,350,000 |
| Southern | 652,755 | 4,229,396,000 | 1,662,336,000 |
| Western Trunk-Line | 904,986 | 3,117,079,000 | 1,284,798,000 |
| Southwestern | 1,011,151 | 1,942,378,000 | 580,388,000 |
| Mountain Pacific | 1,863,419 | 3,320,930,000 | 1,341,785,000 |

The value added by manufacture in all industries from 1849 to 1939 is shown for all the territories by the chart on the following page.

From this chart it is apparent that Official Territory has maintained its commanding lead in spite of recent marked increases elsewhere, especially in the South. Similarly, for the period 1929 to 1939 the number of wage earners in manufacturing industries in the entire country decreased 11 per cent; in Official Territory, 12 per cent; while in the South there was an increase of 5 per cent. For the same period, values of manufactured products increased 1 per cent in the South, while they decreased 21 per cent for the entire country and 25 per cent in Official Territory. From 1930 to 1940, the number of gain-

fully occupied workers in manufacturing in Official Territory decreased from 70.5 per cent to 69.4 per cent of the nation's total, while in the South there was an increase from 10 per cent to 11.9 per cent. A number of manufacturing activities have increased more rapidly in the South than in Official Territory, though the reverse has been true in other industries. But in spite of the growth in industrial activities in the South and West (which ap-

pellants stress heavily), the percentage comparisons are not particularly revealing because of the great disparity between the bases on which they are computed.

The fact remains that economic development in the South and West has lagged and still lags behind Official Territory. In 1940 the average annual dollar income per person employed in Official Territory was $1,988; in Southern, $940; in Southwestern, $1,177; in Western Trunk-Line, $1,411. Official has 69 per cent of all workers engaged in manufacturing in the United States and 29 per cent of all workers in extractive industries. It has, for example, a high concentration in the manufacture of steel and copper products, though less than 4 per cent of the iron ore reserves, and no reserves of metallic copper. The South and West furnish raw materials to Official and buy finished products back. They are also dependent to a great extent on the markets for their products in Official, which has over 48 per cent of the population of the country, 76 per cent of the national market for industrial machinery and raw materials, 64 per cent for all goods and sources, 62 per cent for consumer luxuries, and 53 per cent for consumer necessities. Yet the South and West suffer rate handicaps when they seek to reach those markets.[18] One of the many illustrations will suffice. Cottonseed oil is a basic agricultural commodity. Class rates on it are

---

[18] The Commission stated, 262 I. C. C. pp. 695–696:

"Although manufacturing has grown in the South and Southwest and to a lesser extent in western trunk-line territory in the last decade, it is still vastly less in diversification and amount than in official territory. The increases in manufacturing in these territories has created a demand for rates which will at once permit the free movement of the manufactured articles, but because of the level of the intraterritorial and interterritorial class rates, such free movement has been impeded insofar as such commodities move at class rates. In most instances it has been necessary either to reduce the class-rate levels or to establish exception or commodity rates in order that the manufactured products may move freely, and this action has frequently been

7 per cent higher from Southern to Official Territory than they are within Official Territory. If the cottonseed oil is manufactured into oleomargarine, the rates from Southern to Official Territory are 35 per cent higher than the rates within Official Territory.

It is said in reply, however, that the disparities which we have mentioned reflect only natural advantages which justify differences in rates. The great concentration of population in the East is said to show that its more favorable rates are justified by the fact that it has many more people to support the roads. The unfavorable income comparisons with the East are thought to establish one of the handicaps under which the roads in the South and West operate. It is pointed out that the heavy preponderance of the nation's total natural resource of energy supply is located in Official Territory—40 to 45 per cent of the total bituminous and semi-bituminous coal supply, practically all of the anthracite resources; 60 per cent of all electric energy originates there. It is said that Official Territory is the logical location for industries which use metals from other territories, since it has the natural supplies of coal. It is also pointed out that the gross income from crops and livestock in Official Territory is the highest

subject to long delays because of the failure of individual carriers or groups of carriers to agree upon a basis.

"Official territory is the greatest consuming territory in the country, and is the market that nearly all manufacturers desire to reach, particularly where they have a surplus of their products to sell. In shipping to official territory, manufacturers in the other territories not only have the disadvantage of location, but are subjected to an additional burden in those instances where they must pay class rates on a much higher level than their competitors in official territory. This situation reacts to the disadvantage of manufacturers in the other territories, and to the advantage of those in official territory, tends to restrict the growth and expansion of the manufacturers in the other territories, and, to some extent, to prevent the establishment of new manufacturing plants in those territories."

in the country, amounting to 31 per cent of the total. From these and comparable data it is argued that the lower rates in Official Territory reflect only inherent advantages which the other territories do not enjoy. It is, therefore, argued that what the Commission has sought to do is to equalize economic advantages, to enter the field of economic planning, and to arrange a rate structure designed to relocate industries, cause a redistribution of population, and in other ways to offset the natural advantages which one territory has over another. It is asserted that such a program is unlawful under *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42, 46, where the Court held that the Act, in its condemnation of discrimination, "does not attempt to equalize fortune, opportunities or abilities." And see *United States* v. *Illinois Central R. Co., supra,* p. 524; *Texas & Pacific R. Co.* v. *United States, supra,* pp. 637–638.

We will revert to this matter when we come to consider whether territorial conditions justify the differences in rates. It is sufficient at this point to say that the record makes out a strong case for the inference that natural disadvantages alone are not responsible for the retarded development of the South and the West, that the discriminatory rate structure has also played a part. How much a part cannot be determined, for every effect is the result of many factors. But the inference of prejudice from the discriminatory rate structure is irresistible. If this discriminatory rate structure is not justified by territorial conditions, then its continued maintenance preserves not the natural advantages of one region but manmade trade barriers which have been imposed upon the country. Such a result cannot be reconciled with the great purposes of § 3 (1) as amended in 1940.

*Fifth.* The Commission found that conditions peculiar to the respective territories did not justify the differences in the territorial class-rate structures. In reaching that

conclusion it first inquired whether the differences in the costs of furnishing the railroad service in the several rate territories justified the existing differences in the levels and patterns of the class rate scales.[19]  The basis of its inquiry was a cost study submitted by its staff.  For cost analysis purposes the United States is divided into areas roughly but not exactly approximating the classification territories.  Thus there are three districts: Eastern, Southern and Western.  Southern district is further divided into Pocahontas region and Southern region.  Eastern district plus Pocahontas region is substantially the equivalent of Official territory.[20]  In the cost study, railroads were assigned to geographical areas; expenses for individual roads were divided into groups, each group being associated with appropriate service units which included revenue car-miles, revenue gross ton-miles, and cars originated and terminated; unit costs were then obtained by dividing the aggregate of the territorial expenses in each group by the applicable territorial units; the costs of particular services were then built up from the unit costs.  Costs were put into two classes—(1) out-of-pocket or variable expenses which vary directly with the kind of traffic handled; (2) constant or fixed costs not capable of assignment to particular kinds of traffic costs [21] which

[19] In *Northern Pacific R. Co.* v. *North Dakota,* 236 U. S. 585, 597, the Court stated, "The outlays that exclusively pertain to a given class of traffic must be assigned to that class, and the other expenses must be fairly apportioned.  It may be difficult to make such an apportionment, but when conclusions are based on cost the entire cost must be taken into account."

[20] For description of exact boundaries, see 262 I. C. C. 605.  For some cost purposes the United States is also divided into 11 cost territories, various combinations of which are equivalent to the rate territories.  For definitions of these cost territories, and a collection of a substantial portion of the Commission's cost data, see S. Doc. No. 63, 78th Cong., 1st Sess.

[21] The sum of the out-of-pocket costs plus a pro rata distribution of the constant or fixed costs is referred to as fully distributed cost.

normally must be borne by the various types of traffic in proportion to the ability of each to pay. The details of the cost study are too intricate and voluminous to relate here. They have been summarized by the Commission. 262 I. C. C. pp. 571–592. It should be noted, however, that allowances for return—computed at both 4 per cent and 5¾ per cent—were included among costs. The allowances for return were based on recommended rate-making values furnished by the Bureau of Valuation. The territorial cost comparisons were principally based on the 4 per cent return figure, the Commission noting that the figure was relatively close to the return earned by the carriers in the year covered by the study, *viz.*, 1939.

To summarize very briefly, the expenses of the carriers were first broken down and translated into territorial average unit costs of performing each of the kinds of services involved in moving a specific shipment or in furnishing a given amount of transportation service in each territory. These unit costs were then multiplied by the number of units of each of the services found to be employed in moving the specific shipment or furnishing the given amount of service in the territory. The process was repeated for a series of different shipments or services sufficient to make the result representative of territorial conditions. Once the average costs for each rate territory were computed, territorial average costs were compared. The principal comparisons were based on the year 1939, although supplementary studies were also made for the periods 1930–1939, inclusive, 1937–1941, inclusive, and 1941. The territorial cost comparisons showed, for example, the costs of hauling given weight loads in a certain type of car for given distances in each territory. They also showed the relative costs of handling the entire traffic consist of each territory. This was designed to eliminate the effects of any differences in consists of traffic between territories compared, by determining first the cost in the territory

318

in which it actually moved and then the cost in each of the other territories. The cost study gave consideration to freight moving for various distances in all kinds of equipment—box, hopper, gondola, tank, stock, flat, and refrigerator cars. Costs were compared for identical loads hauled in the principal types of equipment. Standard loads were then taken. The average weight loads experienced in each territory for various types of equipment were also taken. The aim was to make adjustment for the different types of equipment used and the different average loads between territories. Likewise, comparisons were made of the cost of hauling the entire consist of the traffic of one territory, at the average loads and unit costs applicable in that territory, with the cost of hauling the identical traffic at the average loads and unit costs applicable to the other territories. Comparisons were also made (for the distances the traffic actually moved, by classes of equipment, and at actual average loads) of the relative cost of hauling the consist of traffic of the entire United States, and the costs of carrying the Eastern, Southern and Western consists respectively in each of the several territories.

When it came to the Eastern district, computations were made which both excluded and included the Pocahontas region. That region, for purposes of the study, represented the operation of three railroads— Chesapeake & Ohio, Norfolk & Western, and the Virginian—about 84 per cent of whose freight traffic is coal. For purposes of such a comparative study as this, the exclusion of Pocahontas is considered desirable, since its costs are low because of the very heavy coal tonnage.[22]

[22] 262 I. C. C. p. 578. Similar conditions call for the exclusion of Kentucky in considering figures for the Southern region. And see *General Commodity Rate Increases,* 223 I. C. C. 657.

The Commission attached principal weight to the haul of 300 miles per shipment originated, as that distance most closely approximated the length of haul in each territory in 1939. Relative territorial [23] costs (fully distributed) for traffic moving that distance in box cars and gondola cars were as follows:

[U. S. average=100]

|  | Box cars | | Gondola and hopper cars | |
|---|---|---|---|---|
|  | Assumed 25 ton load | Actual average load | Assumed 50 ton load | Actual average load |
| Eastern (excl. Pocahontas) | 102 | 103 | 100 | 100 |
| Southern | 96 | 97 | 99 | 102 |
| Western | 108 | 108 | 109 | 115 |

The Commission computed that on the foregoing analysis for 100, 300 and 500 miles, the fully distributed costs for the South are generally a little lower than for the East, Pocahontas excluded, while the fully distributed costs in the West exceed those of the East by from 6 to 15 per cent. Similar cost comparisons were made for the several territories for stock-car, refrigerator-car, tank-car, and flat-car traffic. Based on the actual average loads experienced for each class of equipment, the Commission found the costs for the South lower than those for the East (Pocahontas excluded) for traffic moving in all those classes of equipment. The costs for the West are also lower than those for the East as to stock-car, refrigerator-car, and flat-car traffic, but higher for tank-car traffic.

---

[23] Not including Pocahontas in Eastern Territory figures. Relative costs were not shown separately for Western Trunk-Line, Southwestern, and Mountain Pacific territories, the Commission noting that differences between costs for the total West and for each of those three rate territories were relatively small. 262 I. C. C. p. 578.

A territorial comparison of fully distributed costs for carload traffic moving 300 miles in all classes of equipment shows the following: [24]

[U.S. average=100]

|  | Identical loads | Actual average loads |
|---|---|---|
| Eastern (excl. Pocahontas) | 102 | 102 |
| Pocahontas | 67 | 67 |
| Eastern including Pocahontas | 95 | 95 |
| Southern | 98 | 101 |
| Western | 108 | 110 |

The fully distributed costs on identical loads in the South are 4 per cent below those for the East, excluding Pocahontas. The same comparison shows the costs for the West 6 per cent higher than those in the East, excluding Pocahontas. Costs in the South, based on the actual average loads are 1 per cent below those for the East, excluding Pocahontas. In the West they are 8 per cent higher than the latter.

Territorial comparisons based on average net ton-mile carload costs (1930–1939) adjusted for differences in the length of haul and the consist of the traffic were made. They showed that the costs for the South are approximately 1 or 2 per cent below those for the East, excluding Pocahontas. On the other hand, those costs for the West exceeded those of the East, excluding Pocahontas by from 5 to 7 per cent.

Territorial comparisons of the less-than-carload costs were also prepared. They showed that those costs are lower in the South than in the East whether assumed identical loads or actual average loads are taken, and even if

---

[24] Weighting given to the costs for each class of equipment was based on the volume of traffic handled in each type of equipment in the United States. Terminal costs for each class of equipment were weighted for the total United States traffic handled in each class of equipment as measured by tons originated plus tons terminated. Line-haul costs by classes of equipment were weighted for the ton-miles of traffic handled in each class of equipment.

Pocahontas is included in the East. They are higher in the West than in the East. If Pocahontas is excluded from the East the following table shows the comparison for a 300 mile haul:

[U. S. average=100]

| | Assumed identical load | | Actual average load | |
|---|---|---|---|---|
| | Out of pocket | Out of pocket plus constant [1] | Out of pocket | Out of pocket plus constant [1] |
| Eastern (excl. Pocahontas) | 105 | 101 | 94 | 93 |
| Southern | 89 | 87 | 88 | 86 |
| Western | 104 | 109 | 120 | 121 |

[1] Constant costs common to all traffic are not included.

In all territories less-than-carload traffic (1939) was carried at a deficit, Southern making the best showing, Western the worst. That is revealed in the following table:

| | Revenues | Costs [1] | Deficit |
|---|---|---|---|
| Eastern (excl. Pocahontas) | $107,155,756 | $133,308,907 | $26,153,151 |
| Southern | 46,635,725 | 47,451,184 | 815,459 |
| Western | 88,797,938 | 123,146,215 | 34,348,277 |

[1] Out-of-pocket cost plus total solely related expenses plus collection and delivery.

The Commission found that the difference in fully distributed costs for all traffic between the East and the West is largely in the constant or fixed expenses and the passenger and less-than-carload deficits. Out-of-pocket expenses in the South and West are frequently as low as, or even lower than, the out-of-pocket costs in the East. The Commission further found that the increase in freight traffic volume received by the carriers subsequent to 1939 served to reduce the unit costs of transportation in the South and West in a proportionately greater degree than in the East. A somewhat larger percentage of out-of-pocket expenses in the East is variable with added traffic than is true of the South and West, due apparently to the fact that the East, with its higher traffic density, is closer

to its maximum capacity than is true of the others. Thus the influence of added traffic in reducing average costs is greater in the West. On the other hand constant costs (proportionately larger in the South and West) do not increase with added traffic. As illustrative of those circumstances the Commission noted the effect of increases in 1941 of the ton-miles of revenue freight. They increased in 1941, as compared with 1939, 43 per cent in the East, 27 per cent in Pocahontas, 44 per cent in Southern and 46 per cent in Western Territory. The cost per revenue ton-mile decreased by only about 5 per cent in the East and in Pocahontas, as compared with decreases in excess of 10 per cent in the South and West.

The Commission summarized the results of the territorial cost comparisons as follows: There is little significant difference in the cost of furnishing transportation in the South as compared with the East, Pocahontas excluded. It is principally the low terminal costs in the South that account for its relatively low total costs. Based on the year 1939 and the period 1930–1939, the costs in the South are equal to or a little lower than those in the East. Based on the period 1937–1941, the costs in the South are substantially lower than those in the East.[25] Based on the year 1939 and the period 1930–1939, the cost of rendering transportation service in the West is between 5 and 10 per cent higher than in the East, excluding Pocahontas. Based on 1941, that difference is reduced to 5 per cent or less.[26]

The Commission recognized, of course, that carriers must obtain their revenue from the traffic which moves in

[25] If Pocahontas is included in the East, the costs for the South, based on the year 1939, are between 3 and 6 per cent above those for the East; for the years 1930–1939, between 6 and 8 per cent higher; for the years 1937–1941, about the same.

[26] If Pocahontas is included in the East for 1930–1939, the cost in the West is 18 per cent higher; based on 1939, approximately 15 per cent higher; based on 1941, about 10 per cent higher.

their respective territories. Hence the revenue-producing
or rate-bearing characteristics of the different commodities
which compose the traffic of the several territories, *i. e.,* the
consists and volumes of traffic, are also important in de-
termining whether territorial conditions justify differences
in territorial rates.

The percentage distribution of total tons carried and
revenue by commodity groups for 1939 is shown in the
following table:

| | Eastern district | | Eastern (including Pocahontas) | | Southern region | | Western district | |
|---|---|---|---|---|---|---|---|---|
| | Percent of ton-nage | Percent of rev-enue | Percent of ton-nage | Percent of rev-enue | Percent of ton-nage | Percent of rev-enue | Percent of ton-nage | Percent of rev-enue |
| Group I: Products of agriculture | 6. 57 | 8. 73 | 6. 07 | 8. 03 | 10. 80 | 17. 73 | 18. 88 | 23. 70 |
| Group II: Animals and products | 1. 64 | 4. 72 | 1. 47 | 4. 23 | 1. 45 | 3. 51 | 3. 00 | 6. 30 |
| Group III: Products of mines | 58. 06 | 34. 85 | 61. 53 | 40. 24 | 46. 39 | 23. 65 | 36. 64 | 13. 98 |
| Group IV: Products of forests | 2. 43 | 2. 74 | 2. 43 | 2. 69 | 11. 40 | 9. 45 | 10. 59 | 9. 31 |
| Group V: Manufactures and miscellaneous | 29. 57 | 41. 41 | 26. 89 | 37. 75 | 27. 21 | 34. 66 | 29. 38 | 39. 94 |
| Total all carload traffic | 98. 27 | 92. 45 | 98. 39 | 92. 94 | 97. 25 | 89. 00 | 98. 49 | 93. 23 |
| All less-than-carload traffic | 1. 73 | 7. 55 | 1. 61 | 7. 06 | 2. 75 | 11. 00 | 1. 51 | 6. 77 |

The Commission also considered the distribution of car-
load traffic based on revenue ton-miles for 1939 which it
summarized as follows:

| Item | Eastern district | Pocahontas region | Southern region | Western district |
|---|---|---|---|---|
| Products of agriculture | 10. 7 | 2. 7 | 15. 8 | 26. 8 |
| Animals and other products | 3. 8 | . 5 | 2. 2 | 4. 5 |
| Products of mines | 49. 3 | 87. 4 | 40. 8 | 20. 1 |
| Products of forests | 3. 1 | 1. 6 | 11. 6 | 13. 6 |
| Manufactures and miscellaneous | 33. 1 | 7. 8 | 29. 6 | 35. 0 |
| Grand total, carload | 100. 0 | 100. 0 | 100. 0 | 100. 0 |

And the contribution which the major classes of commodities (carload lots) make in excess of out-of-pocket costs (1939) appears as follows:

| Item | Eastern district | Pocahontas region | Southern region | Western district | United States |
|---|---|---|---|---|---|
| Products of Agriculture_____ | 4.2 | 3.1 | 15.8 | 18.0 | 10.8 |
| Animals and products_____ | 1.5 | 1.1 | 3.4 | 4.3 | 2.7 |
| Products of mines_____ | 38.0 | 73.4 | 21.2 | 13.9 | 29.7 |
| Products of forests_____ | 2.8 | 2.8 | 9.4 | 8.1 | 5.7 |
| Manufactures and miscellaneous_____ | 53.5 | 19.6 | 50.2 | 55.7 | 51.1 |
| Grand total, carload___ | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

A large volume of all traffic moves across territorial boundaries and therefore becomes common to two or more territories. And as respects the balance, the Commission found striking similarity in the consists of the traffic so far as its revenue-producing characteristics are concerned. The manufactures and miscellaneous commodity group embraces traffic which moves at relatively high rates, i. e., rates which, ton-mile for ton-mile, make a substantially greater than average contribution to the constant costs. The percentages of the total tons carried in that group and the corresponding percentages for revenue produced by them are quite close to each other—particularly the East and the West.

The Commission stated that the revenue-producing qualities, or rate-bearing characteristics, of the commodities which compose the traffic in those several territories constituted "the governing factor" so far as the problem of the consists and volume of traffic was concerned. 262 I. C. C. p. 694. It appraised the evidence we have related as meaning that "the differences that exist in the consists of traffic in these respective territories are not so substan-

tial or of such character as to warrant the present differences in class rates." *Id.*, p. 695.

The findings of the Commission both as to the consists of the freight and the costs of rendering the service in the respective territories are vigorously challenged, especially by the western roads.

As to the consists, it is said that the eastern roads have a much heavier percentage of freight of a kind that produces excess revenue to carry the general expenses. Findings of the Commission are relied upon as showing that the eastern roads' preponderance of high-grade traffic affords a greater source of revenue than does the high percentage of low-rate products carried by the western roads.[27] These undisputed facts are said to disprove

[27] It is pointed out, as the Commission found, that livestock is a commodity which cannot do more than pay its own way; that products of the forest are subject to freight rates below the higher brackets; that agricultural products carry a low rate. The western district roads originated 36.91 per cent of the total tons of carload traffic originated in the United States (excluding Pocahontas) in 1941, while the eastern roads originated 47.40 per cent. To that disparity is added the fact that of the total agricultural products originated in the country in 1941 the western district roads originated 68.82 per cent as contrasted to 20.88 per cent by the eastern carriers excluding Pocahontas. For manufactures and miscellaneous tonnage the percentages were 28.06 per cent and 60.66 per cent, respectively. It is pointed out that while the difference between the percentage of agricultural products originated by the western carriers (68.82 per cent) and the percentage of manufactures and miscellaneous originated by the eastern carriers (60.66 per cent) is only 8 per cent, the eastern roads' tonnage of the latter group of commodities (which are high-grade traffic) is almost three times the tonnage of products of agriculture originated by the western carriers. Like comparisons are made between other groups of commodities carried by the eastern and western carriers respectively. Of the total tons of animals and products originated in the country in 1941 (excluding Pocahontas), the western roads originated 63.03 per

the Commission's finding that the consists of traffic in the respective territories do not warrant the present differences in class rates.

These facts, however, relate to density of traffic,[28] the effect of which is merged in the final cost figures. But the relation of the consist problem to the problem of rate structures is somewhat different. It is relevant in order to determine whether the consists of traffic are so different in the several territories that separate rate structures with different distributions of the transportation burden amongst commodities and classes of freight are necessary. It is apparent from the statistics which we have reviewed that, while there is a diversity in traffic moved in the several territories, the diversity largely disappears when commodity groups are considered. Then, also, the percentages of the total traffic in each territory which fall under the several commodity groups are not only very similar in the East, South, and West, but each group yields about the same percentage of the total revenues in each of the territories. The choice of groupings is plainly a specialized problem in transportation economics upon which the Commission is peculiarly competent to pass. Its judgment that the differences in consists between the territories do not justify the present differences in interterritorial class rates is, indeed, an expert judgment entitled to great weight. We could not disturb its findings on the facts of this record without invading the province reserved for the expert administrative body.

---

cent, the eastern, 28.51 per cent. Of the total tons of products of forests originated in 1941, the respective percentages were 58.73 per cent and 7.52 per cent. And for products of mines the percentages were 33.31 per cent and 49.85 per cent, respectively.

[28] The 1941 revenue ton miles per mile of line were as follows:

Eastern District (excluding Pocahontas).................. 3,392,964
Pocahontas Region....................................... 7,519,840
Western District........................................ 1,358,041

As to the cost study little need be said concerning the South. Once the integrity of the cost study is assumed,[29] the finding of the Commission that there is little significant difference in the cost of furnishing transportation in the South as compared with the East has support in the facts. Moreover, the data on rates of return and freight operating ratios, to which we will shortly refer, corroborate the conclusion reached from the cost study that the differences in class rates between the East and the South are not justified by territorial conditions. The finding that the discrimination against the South is unlawful under § 3 (1) is thus amply supported—a conclusion that the southern carriers do not challenge here.

The question is a closer one when we turn to the West. For, as we have seen, the costs in the West on the average run higher than those in the East. Based on the year 1939 and the period 1930–1939, the cost of rendering transportation service in the West is between 5 and 10 per cent higher than in the East, excluding Pocahontas. Based on 1941, that difference is reduced to 5 per cent or less.

---

[29] Costs developed in the cost scales and the carriers' total known expenses by cost territories were reconciled within a very close margin as appears from the following table:

| Territory | Aggregate expenses, increased for a 4-percent return computed by applying costs to traffic handled (1939) | Actual expenses as reported by carriers increased for a 4-percent return (1939) | Ratio (percent) of computed expenses to actual expenses |
|---|---|---|---|
| Eastern | $1,426,950,260 | $1,451,484,949 | 98.3 |
| Pocahontas | 183,076,590 | 185,387,990 | 98.8 |
| Southern | 450,448,155 | 449,001,663 | 100.3 |
| Western | 1,382,549,982 | 1,395,188,845 | 99.1 |
| United States | 3,443,024,987 | 3,481,063,447 | 98.9 |

The Commission stated, "Judging from the above table, whatever errors may exist in the . . . studies, they have not had the effect of overstating or understating the carriers' costs in the aggregate to any appreciable degree." 262 I. C. C. p. 587.

As we have seen, the class rate structure is discriminatory as between the East and the West. The level of class rates in the West is from 30 to 59 per cent higher than that in the East. The problem of the Commission, therefore, was to determine whether that disparity is justified by territorial conditions. The Commission found that it was not so justified. The problem for us is whether the Commission had a basis for its conclusion.

While the western roads vigorously challenge the Commission's finding, their argument is in the main directed to the point that some disparity in rates between East and West is justified by differing territorial costs. No particular effort is made to prove that those costs are a fair measure of the existing rate differences.

We start, of course, from the premise that on a subject of transportation economics, such as this one, the Commission's judgment is entitled to great weight. The appraisal of cost figures is itself a task for experts, since these costs involve many estimates and assumptions and, unlike a problem in calculus, cannot be proved right or wrong. They are, indeed, only guides to judgment. Their weight and significance require expert appraisal.

The Commission has concluded that while cost studies are highly relevant to these rate problems they are not conclusive. It said in this case:

"Discretion and flexibility of judgment within reasonable limits have always attended the use of costs in the making of rates. Costs alone do not determine the maximum limits of rates. Neither do they control the contours of rate scales or fix the relations between rates or between rate scales. Other factors along with costs must be considered and given due weight in these aspects of rate making." 262 I. C. C. p. 693.

In appraising the cost figures relevant here the Commission proceeded on the assumption that the 1941 traffic

level is most likely to prevail in the postwar period. It therefore started with the assumption that the margin of difference between the costs in the West and those in the East was slight and not accurately measured by 1939 figures, and that if, as has been the fact,[30] the freight carried in the West increased above that level the unit costs of transportation in the West would be reduced to a greater degree than those in the East, for reasons which we have already stated.

The Commission also had before it certain data relative to the financial condition of the various roads, data which we have not yet discussed. Thus comparative analyses of the rates of return of the roads in the several territories showed that while the western roads have had many lean years, the recent period has put them ahead of the roads in the East. The following table shows the rates of return in percentages based on the net railway operating income and the book investment, increased for cash, materials and supplies:

| | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 | 1942 | 1943 |
|---|---|---|---|---|---|---|---|---|
| Eastern district | 2.67 | 2.27 | 1.26 | 2.34 | 2.66 | 3.62 | 4.9 | 4.32 |
| Southern region | 2.52 | 2.35 | 1.9 | 2.5 | 2.57 | 4.24 | 6.51 | 5.73 |
| Pocahontas region | 7.58 | 6.61 | 4.54 | 5.89 | 6.21 | 6.67 | 5.29 | 5.22 |
| Western district | 1.88 | 1.71 | 1.09 | 1.65 | 2.06 | 3.36 | 5.8 | 5.22 |

The Commission also considered the territorial freight operating ratios—the per cent of operating revenues from freight absorbed by operating expenses attributed to the freight.[31] They are shown in the following table:

---

[30] In the twelve months ended October 31, 1946, the revenue tons carried in the West were 26 per cent higher than for the year 1941, and the revenue ton miles were 43 per cent higher than in 1941.

[31] See White, Analysis of Railroad Operations (1946) pp. 14–15, pp. 69, et seq.; Locklin, Economics of Transportation (1938) p. 581; Miller, Inland Transportation (1933) pp. 500–502.

|  | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 | 1942 | 1943 |
|---|---|---|---|---|---|---|---|---|
| Eastern district_____ | 64.95 | 67.86 | 68.98 | 64.88 | 63.92 | 63.04 | 61.93 | 66.23 |
| Southern region_____ | 65.38 | 67.77 | 66.73 | 64.99 | 65.34 | 61.07 | 56.84 | 59.41 |
| Pocahontas region_____ | 47.04 | 50.63 | 53.59 | 50.71 | 49.77 | 48.12 | 49.62 | 52.86 |
| Western district_____ | 65.07 | 66.93 | 67.13 | 65.01 | 63.63 | 60.98 | 55.79 | 59.47 |

In light of such data the Commission said:

"Making due allowance for a substantial decline in traffic from the war peak and for the fact that in the decade preceding 1940 the earnings of the western rail respondents were relatively low, nevertheless, insofar as the prospects of traffic and revenues in the immediate future can be foreseen, there is no reason to conclude that the interim adjustment will have any serious effect upon those respondents." 264 I. C. C. 63–64.

The Commission went on to note that intrastate class rates generally in most of the western States and many of the interstate class rates in western territory were already lower than those prescribed in the interim orders. It accordingly concluded that the western roads "cannot consistently maintain these sub-normal class rates and continue to maintain the relatively high basis of interstate class rates . . . ." 264 I. C. C. p. 64.

Moreover, as we have already noted, class rates have to a great extent fallen into disuse. This fact is relevant here in two respects. In the first place, the orders of the Commission affect class rates and class rates alone, the Commission not dealing with exception and commodity rates by the interim action which it has taken. So far as present freight movement is concerned, the orders affect a much smaller fraction of the traffic in the West than in the East. The Commission said:

"The record does not support the contentions that the revenue needs of the western rail respondents with

respect to their class-rate traffic are greater than those of the eastern rail respondents. From the carriers' reports to us for the years 1942, 1943, as shown in our original report, and 1944, it clearly appears that there is a greater need for revenue by rail carriers in the eastern district as compared with rail carriers in the western district or in the southern region. The report shows also that a much larger percentage of the total traffic in the eastern district moves on class rates than in the western district or in the southern region." 264 I. C. C. pp. 64–65.

In the second place, the existing rate structure singles out the class rate traffic in the West for the payment of unusually high rates. The class rate traffic is largely that of small shippers, who do not have the ability to obtain the benefit of the lower exception or commodity rates.

We cannot, therefore, treat this case as if it were one where the Commission, in spite of a showing of some increased cost in the West, reduced all freight rates to a level of equality with the East. It is a case of determining whether the discrimination against one small class of traffic is warranted by the showing of some increased cost in the West. The earning power of the carriers, their freight operating ratios, their rates of return, the estimate of the volume of traffic in the future, the nature and amount of traffic presently involved in the class rate movements are all relevant to the finding of unlawful discrimination. We cannot say that these considerations do not counterbalance or outweigh the disparity in costs between East and West. The appraisal of these numerous factors is for transportation experts. They may err. But the error, if any, is not of the egregious type which is within our reach on judicial review.

As we have noted, *Interstate Commerce Commission* v. *Diffenbaugh, supra,* p. 46, held that the Act, in its

condemnation of discrimination, "does not attempt to equalize fortune, opportunities or abilities." But the Commission made no such effort here. It eliminated inequalities in the class rates because it concluded that the differences in them were not warranted by territorial conditions. We think that the findings supporting that conclusion are based on adequate evidence.

It is argued that the comparison of rates of return and freight operating ratios overlooks the fact that both reflect the higher freight revenue level that prevails in the West. And it is urged that without the rate advantage which the western carriers now enjoy, any comparison which now appears to favor the western carriers would disappear. That argument assumes a constancy in freight traffic and on that assumption could be mathematically demonstrated. But we are dealing here with a problem of discrimination—a western rate structure which, as compared with the eastern, is not warranted by territorial conditions and which prejudices the growth and development of the West. It would be a large order to say that the removal of that trade barrier will have no effect in increasing traffic. The assumption on which the finding of prejudice is made is, indeed, to the contrary. Moreover, that argument would protect a discriminatory rate structure from the power of revision granted the Commission under § 3 (1) by the easy assumption that without discrimination the carriers would not thrive. But that flies in the face of history and is contrary to the Commission's expert judgment on these facts.

*Sixth.* An extended argument is made by the western roads, challenging the class rate reduction on less-than-carload lots. The argument is twofold—first, that the case of unlawful discrimination has not been made out for this type of class rate traffic; second, that the new less-than-carload class rates are confiscatory.

We have referred to some of the cost figures on less-than-carload lots. We have seen that those cost figures run higher in the West than in the East; that even when no constant costs common to all traffic are allocated to less-than-carload traffic, the deficit in the West is substantially higher than that in the East. The Commission noted that less-than-carload traffic as a whole is carried at a deficit in all territories, except possibly in the South. It also noted that in all territories it was not bearing its proper share of the costs of transportation; that, apart from wartime loading, it was not yielding, on the average, its out-of-pocket costs plus constant expenses solely related to less-than-carload traffic [32] plus the cost of collection and delivery, in any territory except possibly the Southern. 262 I. C. C. p. 697.

Little need be said concerning the argument that a case of unlawful discrimination has not been established in the case of less-than-carload traffic. The Commission concluded that if less-than-carload class rates were left unchanged while carload class rates in Southern, Southwestern and Western Trunk-Line territories were reduced 10 per cent, "the competitive relations between shippers shipping in less-than-carload quantities and those shipping in carloads" would be materially affected. 264 I. C. C. p. 66. Less-than-carload traffic is less than 2 per cent of total railroad freight tonnage, and much of that moves, not on class rates, but on exception rates and commodity rates. In Western Trunk-Line and Southwestern territories many intrastate and interstate class rates are now voluntarily maintained on less-than-carload traffic which are lower than the corresponding reduced interstate class rates required by the interim orders. There are other

---

[32] Constant costs solely related to less-than-carload traffic are those costs which do not vary with the volume of the traffic, but which could be eliminated if no less-than-carload traffic were handled.

circumstances, to which we will shortly advert, which reinforce the action of the Commission in reducing class rates on less-than-carload traffic. But the ones we have mentioned are adequate to support the Commission on the discrimination phase of the problem. The Commission was dealing not with discrimination against a particular commodity but with discrimination against entire regions. It was a complete rate structure that was subject to inquiry and revision. Once the Commission concluded that unlawful discrimination existed in the main features of that rate structure, it was justified in removing it. In eliminating the discrimination and establishing the uniformity required by the law, it was warranted in making minor collateral readjustments so that the Commission itself would not in turn create new discriminations. The adjustment of the less-than-carload class rates was permissible on that ground alone. The traffic affected was only a fraction of 2 per cent of the total traffic. Without that readjustment that class of traffic would be prejudiced. With that readjustment the prejudice would be removed and the entire rate structure—intrastate and interstate— would be more nearly rationalized.

That does not, of course, answer the argument on confiscation. The latter requires more extended treatment.

The western roads in their petition for rehearing before the Commission raised the confiscation point. But in doing so they rested on the record before the Commission and tendered no additional evidence. In the District Court, however, they presented further evidence which was received over objection and considered by that court.

This, therefore, is not a case like *Baltimore & Ohio R. Co.* v. *United States,* 298 U. S. 349, 363, 371–372, where the Commission refused to receive evidence proffered on the point of confiscation. Here, as we have said, the Commission received all evidence that was offered; and

when its order was announced and made known and the petition for rehearing was filed, the opportunity to tender additional evidence to bolster the confiscation point was not accepted. As stated in *Manufacturers R. Co.* v. *United States,* 246 U. S. 457, 489–490, and in *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 53–54, correct practice requires that, where the opportunity exists, all pertinent evidence bearing on the issues tendered the Commission should be submitted to it in the first instance and should not be received by the District Court as though it were conducting a trial *de novo.* The reason is plain enough. These problems of transportation economics are complicated and involved. For example, the determination of transportation costs and their allocation among various types of traffic is not a mere mathematical exercise. Like other problems in cost accounting, it involves the exercise of judgment born of intimate knowledge of the particular activity and the making of adjustments and qualifications too subtle for the uninitiated.[33] Moreover, the impact of a particular order on revenues and the ability of the enterprise to thrive under it are matters for judgment on the part of those who know the conditions which create the revenues and the flexibility of managerial controls. For such reasons, we stated in *Board of Trade* v. *United States,* 314 U. S. 534, 546:

"The process of rate making is essentially empiric. The stuff of the process is fluid and changing—the

[33] See Hamilton, Cost as a Standard for Price, 4 Law & Contemp. Prob., 321, 329:

"Now and then a hardy soul, equipped with simple faith and a calculating machine, essays the adventure of rates based upon the true costs of particular services. The feat is, of course, technically impossible, for value judgments or empirical rules are essential to the distribution of overhead. A calculation of the real cost of transporting cotton-seed in less than carload lots from Lampassas, Texas to Kankakee, Illinois, is a stubborn exercise in imputation."

> resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems."

Thus we think that if the additional evidence was necessary to pass on the issue of confiscation, the cause should have been remanded to the Commission for a further preliminary appraisal of the facts which bear on that question. But we do not take that course here for reasons which will shortly appear.

The Commission explained its finding that less-than-carload traffic was being carried at large deficits and was not bearing its proper share of transportation costs. That finding was based on the operation of the roads in 1939 when the average load per car of less-than-carload shipments amounted to only 4.3 tons in the West. Since 1939 there has been a substantial increase in the average loading of such shipments, which was brought about under wartime conditions and which has materially decreased the unit costs attributable to less-than-carload traffic. In the judgment of the Commission it was not shown that loadings in the immediate postwar period were likely to decline to 1939 levels. Moreover, the cost data on less-than-carload traffic related to such traffic as a whole and not solely to that moving on class rates. As we have noted, much of this traffic moves not on class rates but on exception rates and commodity rates. The class-rate traffic bears the highest rates. The past failure of this traffic, as a whole, to carry its proper share of the costs may well have been due in large measure to the maintenance of exception and commodity rates.

The western roads present elaborate analysis (based both on the Commission's cost figures and on costs as adjusted by the evidence introduced in the District Court)

which shows less-than-carload traffic largely carried at deficits irrespective of the class rate paid under the interim orders. They contend that the loading figure of 4.3 tons is the only reliable one to use in projecting the costs and revenues into the postwar period, since it was in fact the average loading prior to the war, and will be once more, as soon as the order of the Office of Defense Transportation which requires ten-ton loading is revoked. And computations are presented based on that figure which show deficits in less-than-carload traffic, deficits which are increased when the Commission's cost figures are adjusted to reflect cost increases to January 1, 1946. All of those computations include as constant costs only those which related to this traffic. And it is pointed out that if all constant costs were included, the computed deficits would substantially increase.

On the other hand the Commission shows that on the basis of the new interim rates this traffic in the West would produce revenues in excess of out-of-pocket expenses plus 4 per cent return plus collection and delivery expenses plus loss and damage payments. That computation is based on a ten-ton loading figure. And on the basis of those types of costs, there is an excess of revenue even though the costs are increased to the January 1, 1946 level. The 1939 less-than-carload costs [34] in the West were 30 per cent greater than revenues from all such traffic. If the class-rate portion of less-than-carload traffic is taken, the costs are 81 per cent of the revenues, provided certain adjustments are made: (1) increased revenues from the increase in the minimum charge per shipment from 55 to 75 cents which the Commission authorized in this proceeding; (2) the elimination of less-than-carload traffic moving on exception, commodity, and intrastate rates; (3) a 10-ton load; and (4) a 2.47 per cent rate of return, which was the actual rate of return of 1939.

---

[34] Out-of-pocket costs plus solely related constant costs.

We do not stop to analyze the various computations in order to ascertain the exact relation between revenues and costs of less-than-carload traffic. That, indeed, would not be feasible on this record. For even the Commission made no attempt to determine what share of *all* costs should fairly be allocated to less-than-carload traffic. Hence, if the Commission had spoken its final word, and if it were believed necessary as a matter of constitutional law, see *Northern Pacific R. Co.* v. *North Dakota,* 236 U. S. 585; cf. *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, 602, to fix a less-than-carload class rate which produced a fair return on that particular traffic, the case would have to be remanded to the Commission for appropriate findings on this phase. The difficulty of treating the issue on the present record is illustrated in another way. Less-than-carload traffic, more than carload traffic, carries costs which to a degree are dependent on the carrier. Heavy or light loadings, speed of service, ratio of empty return cars, methods of loading freight so as to reduce damage claims, substitution of auxiliary truck service and the like turn on competitive conditions. Certainly rates need not compensate carriers for the most expensive way of handling less-than-carload service. Yet the present findings do not illuminate that problem nor provide the standard in terms of service for measuring the compensatory character of the less-than-carload class rates. And on such a problem the Commission's highest expert judgment would be called into play.

But the Commission has not finished with this problem. In the first place, as we point out hereafter, the Commission, subsequent to the issuance of these interim orders, granted a nationwide increase in freight rates, including an increase on less-than-carload rates. The temporary injunction has prevented the interim orders reducing class rates in the West by 10 per cent from going into effect.

When, therefore, the interim orders do go into effect, the actual rates chargeable presumably will be increased from the level fixed by the interim orders to the level prescribed by the recent order increasing all freight rates. Thus no loss has been suffered by the 10 per cent reduction on less-than-carload class rates; and any loss which would have been suffered by that rate reduction has probably been at least lessened, if not eliminated, by the general rate increase. Though it is argued that such is not the case, the showing is too speculative on this record for us to decide what the precise effect of the revised class rates on less-than-carload traffic will be. In the second place, as we have noted, the Commission made the present interim adjustment of class rates on less-than-carload traffic as a consequence of its reduction in carload class rates so that less-than-carload shippers would not suffer a disadvantage from the removal of the major discrimination in the class rate structure. The interim or temporary nature of the adjustment was recognized by the Commission when it admonished the carriers "to give careful consideration to the rates maintained by them on less-than-carload traffic with a view to making readjustments in ratings or rates, as promptly as possible, which will insure that the rates on such traffic are on a compensatory level." 264 I. C. C. 66–67. And it recognized but left untouched the problem of determining what would be the proper share of transportation costs to be borne by less-than-carload traffic.

The justification the Commission had for leaving the problem in that condition at this stage of the proceedings is apparent. The carriers are now preparing the new uniform classification. They have it within their power to follow the lead suggested by the Commission and to propose classification differences between carload and less-than-carload traffic which will obviate any issue of confiscation respecting less-than-carload rates. And it

has likewise left open the question of readjustment of the class rates on less-than-carload traffic when the total program, of which these interim orders are but a part, is put into effect.

Where the result of a rate order is not clearly shown to be confiscatory but its precise effect must await operations under it, the Court has refused to set it aside despite grave doubts as to its consequences. See *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 17–18. And see *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 54–55; *Darnell* v. *Edwards,* 244 U. S. 564, 570; *Brush Electric Co.* v. *Galveston,* 262 U. S. 443, 446; *St. Joseph Stock Yards Co.* v. *United States, supra,* p. 69. The reasons for following a like course are equally impelling here. The Commission has not placed the western roads in a strait jacket. It has made an interim reduction on less-than-carload class rates as an incident to its removal of discriminations in carload class rates. It has indicated the course to be followed by the carriers, as a part of the overall classification and class rate problem, to make certain that these rates are compensatory. We are thus dealing with a problem which is in flux, an interim order made necessary as a result of a comprehensive revision of entire rate structures. Moreover, the conclusion to be drawn from the recent general increase in freight rates is too uncertain and speculative on this record for us to pass on the confiscation issue. See *Brush Electric Co.* v. *Galveston, supra.* The District Court amply protected appellants when it overruled their claim that the interim rates are confiscatory without prejudice to another suit to challenge the legality of those rates if, after a fair test, they prove to be below the lowest reaches of a reasonable minimum or if the permanent rates do not meet that standard. See *Darnell* v. *Edwards, supra,* p. 570.

*Seventh.* It was held in *Texas & Pacific R. Co.* v. *United States, supra,* p. 650, that where the Commission makes

an order under § 3 to remove an unlawful discrimination, the carriers must be afforded the opportunity to "abate the discrimination by raising one. rate, lowering the other, or altering both." But that ruling was qualified by the statement that the Commission need not follow that course in case it acts under § 15 (1). *Id.,* p. 650, note 39. Section 1 (5) (a) of the Act provides that all charges for the transportation of property "shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful." And see § 1 (4). Section 15 (1) provides that when the Commission finds that "any individual or joint rate, fare, or charge" of a common carrier is "unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial," the Commission may determine and prescribe "what will be the just and reasonable" rate. And see § 15 (3). The words "unjustly discriminatory or unduly preferential or prejudicial" plainly refer to practices condemned by § 3 (1). A proper finding of unlawful discrimination under § 3 (1) thus enables the Commission not only to direct the carriers to eliminate the practice but also, pursuant to § 15, to prescribe the alternative. See *Youngstown Sheet & Tube Co.* v. *United States,* 295 U. S. 476. Thus the Commission in this type of situation, as in the case where intrastate commerce is involved, *Georgia Public Service Commission* v. *United States,* 283 U. S. 765, may remove unlawful discriminations and prescribe new rates.

In *Texas & Pacific R. Co.* v. *United States, supra,* p. 650, it was also stated that, "A carrier or group of carriers must be the common source of the discrimination—must effectively participate in both rates, if an order for the correction of the disparity is to run against it or them." And it was held in *Central R. Co.* v. *United States,* 257 U. S. 247, 259, that mere participation in joint rates does not make connecting carriers partners in discrimination;

that they can be held responsible for unjust discrimination only if each carrier has participated in some way in the practice which causes the discrimination, "as where a lower joint rate is given to one locality than to another similarly situated." It is argued that the same rule applies in this case since, for example, the western carriers have no control of or participation in the lower Official intraterritorial rates, although they do participate in the joint or through interterritorial rates.

In reply it is said that carriers in Official Territory control rates within that area and also control, jointly with the carriers in each of the other territories, the rates from each of them into Official. That common source of discrimination is said to be sufficient to sustain the Commission's action. See *St. Louis Southwestern R. Co.* v. *United States,* 245 U. S. 136; *Chicago, I. & L. R. Co.* v. *United States,* 270 U. S. 287. But we do not need to decide the question. For the principle announced in *Central R. Co.* v. *United States* and *Texas & Pacific R. Co.* v. *United States, supra,* is applicable only where the Commission is directing the carriers to remove the discrimination. Those cases hold that the Commission may not require carriers to do what they are powerless to perform. But the Court recognized in *Central R. Co.* v. *United States, supra,* p. 257, that where the Commission acts pursuant to § 1 to require carriers to establish, in connection with through routes and joint rates, reasonable rules and regulations, that problem is not involved. For then the Commission corrects the unlawful discriminatory practice in the case of each carrier by prescribing the just and reasonable rate or practice. The same is true where, as here, the Commission in order to eliminate territorial discriminations proceeds under § 15 (1) to fix new reasonable rates. If the hands of the Commission are tied and it is powerless to protect regions and territories from discrimination unless all rates involved in the rate relationship are con-

trolled by the same carriers, then the 1940 amendment to § 3 (1) fell far short of its goal. We do not believe Congress left the Commission so impotent.

It may not be said in this case, as it was held in *Texas & Pacific R. Co.* v. *United States, supra,* p. 633, that there was no evidence of the unreasonableness of the rates, or that that question was not in issue. The Commission here found that the rates were unjust and unreasonable under § 1 and it proceeded to fix new rates under § 15 (1). The facts which establish that the differences in rates as between the several territories are not warranted by territorial conditions plainly sustain its findings under § 1.

As we have said, this proceeding pertains only to class rates, which move but a small percentage of the traffic. It is, therefore, argued that the Commission should not have made adjustments in those rates without bringing about some equalization of exception and commodity rates under which the bulk of the traffic is moved. But there is no reason in law why the Commission need tackle all evils in the rate structure or none. It may take one step at a time. Cf. *United States* v. *Wabash R. Co.,* 321 U. S. 403. The 10 per cent interim rate order did not attempt to bring about complete elimination of the discriminatory features of the class rate structure. It was only an approximation of that result, the complete step awaiting the new uniform classification. But the reasons justifying that partial measure likewise support the action of the Commission in commencing with class rates when it tackled the problem of territorial discriminations.

*Eighth.* A different problem is presented when we turn to the 10 per cent increase in class rates which the Commission prescribed for Official Territory. Appellants strenuously urge that this action of the Commission was unauthorized under the Act, even if the other portions of its orders were justified.

The finding of the Commission on this phase of the case was that the present class rates in Official Territory were below a just and reasonable level and should be increased 10 per cent as a part of the adjustment of the rate structure in order to remove the unlawfulness both as respects their unreasonable low level and their unduly preferential character. 262 I. C. C. 700–701, 704–705; 264 I. C. C. 62. That finding is said to be without support in the record and to lack the preliminary findings necessary to support it.

It is argued that rates are not unreasonably low in violation of § 1 unless they are either noncompensatory or otherwise threaten harmful effects upon the revenues and transportation efficiency of the carriers in question, or of their competitors. It is said, as is the fact, that no such findings were made by the Commission and that on this record there are no facts which could support such a finding.

If this were a case of determining whether existing rates passed below the lowest or above the highest reaches of reasonableness, the point might be well taken.[35] See *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 506. But we do not have here such a revenue problem. This case presents problems in rate relationships, that is to say, problems of a discriminatory rate structure condemned by § 3 (1). The Commission may remove a discrimination effected by rates, even when they are within the zone of reasonableness, if the discrimination is forbidden by § 3 (1). As Mr. Justice Brandeis stated in *United States* v. *Illinois Central R. Co., supra,* p. 524, the

[35] The point might also be well taken if this were a proceeding under § 13 (4) to determine whether intrastate traffic was producing its fair share of the earnings required to meet maintenance and operating costs and to yield a fair return on the property devoted to interstate and intrastate transportation. *Florida* v. *United States, supra; United States* v. *Louisiana,* 290 U. S. 70; *North Carolina* v. *United States, supra.*

mere fact that one rate is "inherently reasonable, and that the rate from competing points is not shown to be unreasonably low, does not establish that the discrimination is just. Both rates may lie within the zone of reasonableness and yet result in undue prejudice." The Commission has the power to adjust the rates upwards and downwards, within that zone, in order to eradicate the discrimination. That power is not unlimited; there are standards which control its exercise. But as we shall see, the Commission acted within permissible limits here.

Once the Commission has found rates to be "unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial," it is empowered to prescribe rates which are "just and reasonable" or "the maximum or minimum, or maximum and minimum, to be charged . . . ." § 15 (1). In *Youngstown Sheet & Tube Co.* v. *United States, supra,* the Commission, acting under § 15 (1), increased rail rates by prescribing what it found to be reasonable minimum rates. There was no finding that the existing, lower rates were not compensatory. The finding of reasonableness was premised on the grounds that "lower rates would create undue discrimination against shippers in origin districts who cannot use the water-rail route, and would tend to disrupt the rate structure, and to destroy the proper differentials between various producing districts on shipments to Ohio destinations." P. 479. The Commission relied not only on evidence bearing upon the character of the service and cost but also on a comparison of other rates in the same or adjacent territory. The Court sustained the order saying, "The existing rate structure furnished support for the finding of reasonableness." P. 480. In *Scandrett* v. *United States,* 32 F. Supp. 995, 996, aff'd 312 U. S. 661, the Commission had found that proposed reduced rates were "compensatory, considering all costs" but that they were below a minimum

reasonable level and therefore unlawful. It took that action to prevent destructive competition between rail, water, and motor carriers. The court sustained the order. And see *Jefferson Island Salt Min. Co.* v. *United States,* 6 F. 2d 315.

These cases, to be sure, recognize the power of the Commission so to fix minimum rates as to keep in competitive balance the various types of carriers and to prevent ruinous rate wars between them. That plainly is one of the objectives of the Act, and one of the reasons why the Commission was granted the power to fix minimum rates by the Transportation Act of 1920. See H. R. Rep. No. 456, 66th Cong., 1st Sess., p. 19. Cf. *Mississippi Valley Barge Co.* v. *United States,* 292 U. S. 282. But the elimination of discrimination occupies an equally high place in the statutory scheme. And, as we have said, the power granted the Commission under § 15 (1) includes the power to prescribe rates which will substitute lawful for discriminatory rate structures. If the Commission were powerless to increase rates to a reasonable minimum in order to eliminate an unlawful discrimination, unless existing rates were shown to be non-compensatory or unless ruinous competition would result, it would in some cases be powerless to prescribe the remedy for unlawful practices. The present case is a good illustration. A 10 per cent reduction of rates in the South and West would remove only part of the discrimination. On this record it is most doubtful that a full reduction of those rates to the level of Official Territory would be warranted. Yet if the rates in Official Territory may not be increased unless the present ones are shown to be non-compensatory, discrimination against the South and West and in favor of Official Territory would continue to thrive. For shippers in Official Territory would still have a preferred rate, as compared with shippers from the South and West, in reaching the great markets of the East—a preference not

shown to be warranted by territorial conditions. The raising of rates to a reasonable minimum was, therefore, as relevant here as it was in *Youngstown Sheet & Tube Co.* v. *United States, supra,* to the Commission's task of providing a rational rate structure.

The authority of the Commission to increase rates in order to remove discrimination, even though existing rates may be compensatory, is not unlimited. Section 15a (2) of the Act provides:

> "In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service."

The balancing and weighing of these interests is a delicate task. "Whether a discrimination in rates or services of a carrier is undue or unreasonable has always been regarded as peculiarly a question committed to the judgment of the administrative body, based upon an appreciation of all the facts and circumstances affecting the traffic." *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 304. And see *United States* v. *Chicago Heights Trucking Co.,* 310 U. S. 344, 352–353; *Barringer & Co.* v. *United States,* 319 U. S. 1, 6–7. We may assume, however, that if the rates of return of the eastern carriers were substantially above that for the South and the West, an increase of the rates for the former would not be permissible, even in order to remove a discrimination. But, as we have seen, the rate of return in recent

years [36] has favored the southern and western carriers, as have the freight operating ratios. The Commission took those factors, as well as the others we have reviewed, into consideration in determining that an increase in rates in Official Territory was warranted. 264 I. C. C. 61–62.

Revenue needs, like costs of rendering the transportation service, are germane to the question whether differences in territorial rate structures are justified by territorial conditions. They are amongst the standards written into § 15a; they reflect the totality of conditions under which the carriers in the respective territories operate. Should the Commission fail to consider them in determining whether the discrimination inherent in the rate struc-

---

[36] As we point out hereafter, after the present interim orders were issued, the Commission granted a general freight rate increase. See *Ex parte No. 162,* note 37, *infra.* In that case it reviewed the rates of return of the roads in the several territories based on the rates in effect at the time, which of course did not include the 10 per cent increase in class rates for Official Territory authorized in this proceeding but stayed by the District Court. What the Commission said in *Ex parte No. 162* corroborates its finding in the present case concerning the greater relative revenue needs of the roads in Official Territory:

"On the basis of the interim rates in effect since July 1, 1946, the rate of return for the eastern district will be considerably less for 1946 than in the Pocahontas region, the southern region, or the western district, even though an additional increase of 5 percent in certain rates in official territory was authorized and has been in effect since July 1, 1946. It also appears that even on the basis of the increases sought in Ex Parte No. 162 and the railroads' estimates of revenue, the rate of return in the eastern district for 1946 will be less than the rate of return in the Pocahontas region, the southern region, or the western district." 266 I. C. C. 548.

The latter estimates of the rate of return in per cent are as follows:

Eastern District........................................ 2. 06
Pocahontas Region...................................... 6. 26
Southern Region........................................ 4. 01
Western District....................................... 3. 31

tures was unwarranted, it would have not completed its task. There may be differences of opinion concerning the weight to be given those factors, especially the weight to be given the rate of return in the current years as opposed to that in the preceding decade. But their significance is for the Commission to determine; and, though we had doubts, we would usurp the administrative function of the Commission if we overruled it and substituted our own appraisal of these factors.

*Ninth.* After the present interim orders were issued, the Commission granted a nationwide increase in all freight rates.[37] It is argued that this rate increase has rendered the interim orders with which we are here concerned obsolete and unenforcible. It is said that in making the general rate increase, the Commission found greatly different conditions affecting transportation rates from those it found in these proceedings; that the greater increases allowed in Official Territory[38] undo the uniformity policy on which the interim orders are framed; and that the enforcement of the interim orders in light of these changed conditions would produce results plainly not contemplated.

This is not a case where by reason of changed conditions the record is stale. The changed circumstances do not affect the issues here. Cf. *Interstate Commerce Commission* v. *Jersey City,* 322 U. S. 503, 515; *United States* v. *Pierce Auto Lines,* 327 U. S. 515, 535. To repeat,

---

[37] *Ex parte No. 162,* interim report 264 I. C. C. 695, final report December 5, 1946, 266 I. C. C. 537. This increased most basic freight rates by 15 to 25 per cent. Rates on articles under the general commodity grouping of Manufactures and Miscellaneous, class rates and rates on less-than-carload and any-quantity traffic were increased 25 per cent in Official Territory, 20 per cent within and between other territories, and 22.5 per cent between Official Territory and points in other territories. Express rates were increased October 28, 1946. *Ex parte No. 163,* 266 I. C. C. 369.

[38] See note 37, *supra.*

this is a proceeding to eliminate territorial rate differences not justified by territorial conditions. The general rate increase recently granted by the Commission was a revenue proceeding. Revenue adjustments can be and are superimposed on such rate structures as exist. The fact that revenue adjustments may produce lack of uniformity in rates is not inconsistent with the decision in the present case. As we said earlier, § 3 (1) does not dictate a policy of national uniformity in rates; it only requires that the lack of uniformity in rates among and between territories be justified by territorial conditions. The finding of the Commission, if supported by evidence, that the revenue needs of carriers in one territory demand a lower or a higher rate in that territory is a justification for a difference in rates as between that territory and other territories. The order of the Commission granting the general rate increase is not before us and we intimate no opinion on it. It is sufficient for our present purposes to say that it emphasizes the distinction between revenue and rate-relationship cases and in no way impairs the finding in the present case that the existing class-rate structure that has prevailed in the several territories stands condemned under § 3 (1). Nor is there any inherent inconsistency between the interim orders reducing class rates and the recent order increasing all rates. The latter was based on conditions in a period subsequent to the discrimination proceedings. Whether the general rate increase will require adjustments in the new permanent uniform scale which awaits the new uniform classification is a question for the Commission when the new classification is ready.[39]

---

[39] That the order granting the general freight rate increase did not affect the orders in the present proceeding is made clear by the following provision:

"That outstanding unexpired orders in other proceedings are hereby modified so as to permit the increases in freight rates and charges

Other issues raised by appellants need not be discussed. The injunction staying the orders of the Commission is vacated and the judgment of the District Court dismissing the petitions is

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting.

In a case involving issues much narrower than those now here, the Court, only the other day, struck down an order of the Interstate Commerce Commission for want of adequate findings. *Interstate Commerce Commission* v. *Mechling,* 330 U. S. 567, at 583. Although in that case there were explicit findings, the Court deemed them inadequate because they were based on "unsifted averages." In a series of cases the Court has set aside orders of the Interstate Commerce Commission because of the failure of the Commission to ascertain and to formulate with clarity and definiteness the transportation and economic circumstances which alone could justify the order, and thereby afford this Court assured basis for concluding that the Commission had duly exercised its allowable judgment on the factors underlying the ultimate issues. See *Florida* v. *United States,* 282 U. S. 194; *United States* v. *Baltimore & Ohio R. Co.,* 293 U. S. 454; *Atchison, Topeka & Santa Fe R. Co.* v. *United States,* 295 U. S. 193; *United States* v. *Carolina Freight Carriers Corp.,* 315 U. S. 475; *City of Yonkers* v. *United States,* 320 U. S. 685; *Eastern-Central Motor Carriers Association* v. *United States,* 321 U. S. 194; *North Carolina* v. *United States,* 325 U. S. 507; *Alabama*

herein authorized to be established; *Provided,* however, that the provisions of this paragraph shall not be construed to suspend or supersede or modify or affect the findings and order entered in *Class Rate Investigation, 1939,* Docket No. 28300, the operation of which is stayed by court order . . . ."

See *Ex parte No. 162, supra,* note 37.

v. *United States,* 325 U. S. 535. Not one of these cases involved an order having a reach comparable to the reach of the order now before us. We are asked to sustain an order that readjusts the class rates of the whole country barring only the territory west of the Rockies—an order that changes not only the rates within the various rate territories in this vast region, but changes the relation of the rates inter-territorially. I am not unmindful of the complicated nature of the problem which confronted the Commission, of the empiric character of the process of rate-making, of the limited scope for judicial review in this process, of the respect to be accorded to the Commission's conclusions. *Board of Trade* v. *United States,* 314 U. S. 534. But when the outcome of legal issues is bound to cut deeply into economic relations on such a scale, it is not asking too much to ask the Commission to be explicit and definite in its findings on the elements that are indispensable to the validity of its order.

When inter-territorial discrimination is complained of, at least two basic issues confront the Commission: (1) Is there discrimination? (2) If there is, how is the discrimination to be abated? The Commission cannot eliminate discrimination—*i. e.,* harmonize the rate relations between territories—in disregard of the reasonableness of the readjusted rates within each territory. The Interstate Commerce Act must be applied in its entirety and the different sections which make an articulated whole cannot be treated disjointedly. Such is the teaching of our cases, especially of *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, and *Intermountain Rate Cases,* 234 U. S. 476—the two cases which beyond all others give the controlling considerations in construing the Interstate Commerce Act.

And so the Commission is not empowered to remove discrimination between two territories without at the same time considering whether the remedies proposed for such

removal fit the requirement of reasonableness of rates. It may not lower the rates in a territory beyond the level which gives the carriers an income sufficient to enable them to operate effectively as part of the nation's transportation system. And the Commission may not raise rates to a level which would exact freight charges from shippers beyond a rate structure that is reasonable. The small proportion of freight that moves on class rates is no measure of the importance of those rates to the total earnings of carriers. Unreasonable rates—whether unreasonably high or unreasonably low—even on a fraction of the freight, may make the difference between earnings to which carriers are entitled under the Interstate Commerce Act and those to which they are not entitled for discharging their duty as part of the national transportation system. We are without informing findings on these issues. But even if one were to consider questions of discrimination in isolation, inequality—the essence of discrimination—cannot be dealt with mechanically by taking a percentage off one territory and adding it to another. The Procrustean bed is not a symbol of equality. It is no less inequality to have equality among unequals. The findings do not reveal how it happened that putting 10% on and taking 10% off respectively will beget just the right adjustment. I am not suggesting that one might not dig out of the record inexplicit, argumentative support for the view that an increase of 10% in Official Classification Territory rates will still leave the level of rates within that Territory not unreasonable, and that a decrease of 10% in Western Territory will leave the carriers the required reasonableness of rates within that Territory. But it is not conducive to a fair administration of the Interstate Commerce Act, nor is it consonant with the proper discharge of this Court's task, to require us to dig out indications or evidence giving appropriate answer to these issues from a record consisting of nearly 13,000 pages spread over

21 volumes, which led to a report by the Commission of 320 pages.

The District Court acknowledged the absence of finding on such issues. Said the court: "it has been argued that there can be no increase in class rates in Official Territory unless there is first a so-called primary finding, supported by substantial evidence that the present rates are not compensatory. While that fact, if proved, would have been of much significance the failure to prove it and the consequent lack of a finding that present rates are confiscatory does not leave the Commission's finding that the rates are unlawful unsupported by substantial evidence." 65 F. Supp. 856, 873. But the fact that the rates in Official Territory may, as a matter of abstract comparison, be out of line with the rates in Western or Southern Territory is hardly proof that the rates in Official Territory should be increased by the same flat percentage as the rates in the other territories should be decreased. Such a flat increase in Official Territory may make the proposed new rates unlawful because unreasonable. While a 10% decrease in rates in Western Territory may eliminate unfairness to shippers in that territory, it does not follow that a corresponding 10% increase in Official Territory rates will not result in unfairness to shippers there.

One can hardly read the concurring and dissenting views to the Commission's Report without being left with uncertainty regarding the basis of the Commission's order.

"The report does not show, except in nebulous fashion, that the cost figures represent apportionment of totals, based on estimates; that they involve many assumptions and acts of judgment; and are not computations from direct, original cost figures for particular movements. These, however, are the facts. It omits evidence showing that 59 out of 117 items of basic data used in the studies were estimated, and that 458 out of 500 sequences were wholly or partly estimated.

It fails to disclose clearly that when making the studies it was assumed that the consist of the traffic is the same in the different territories, when the fact is, as I have pointed out, that the traffic consist differs widely in the respective territories. The result is that theoretical costs are produced, based upon assumptions which are not facts, and upon comparisons of unlike things." (Commissioner Porter, dissenting, 262 I. C. C. 447, 709, 717; and see dissenting views of Commissioner Barnard, *id.* at 725.)

According to two of the Commissioners the record is wholly inadequate to support a finding that class rates within Official Territory are unreasonable under § 1 of the Act. See 264 I. C. C. 69–70. Certainly the Commission did not make an explicit finding that they are unreasonable. If there is any such finding, it must be sought for as would a needle in a haystack. The Commission's order ought not to be allowed to rest on such dubious foundations.

Nor can such a mechanical or abstractly mathematical readjustment of rates inter-territorially be justified as a tentative adjustment. Of course, the Commission may generalize a sufficient number of typical instances and make a flat readjustment within a territory, leaving instances of unreasonableness to be taken out of such an order upon individual application. This is what the Commission did, and what this Court sustained, in the *New England Divisions Case*, 261 U. S. 184. The order in that case, directing a 15% increase in the share of the New England railroads in the joint through-freight rates, was based upon evidence "which the Commission assumed was typical in character, and ample in quantity, to justify the finding made in respect to each division of each rate of every carrier." 261 U. S. at 196–97. The Court found that the established practice in rate litigation, the nature of the hearing before the Commission, the evidence submitted, the findings made, the opportunities to

apply for modifications in typical situations, amply supported the Commission's findings. The present record, as reflected in the Commission's report, does not present a comparable situation. One gets the impression that the adjustment of a flat 10% decrease in the rates outside the Official Territory and a flat increase of 10% within that Territory is attributable, fundamentally, to a laudable desire on the part of the Commission to secure uniform classification throughout the country. The Commission was not prepared to make such a classification, but it made these rate changes in the hope that they would exert pressure on the carriers to agree upon a uniform classification. It is in relation to that hope that it is urged that the order is merely a conditional or tentative order—conditioned upon agreement by the carriers upon a uniform classification. But to condition the order on the realization of that hope is to condition it, if experience be any guide, on the Greek kalends.

What this Court said in *United States* v. *Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 294 U. S. 499, 510–11, involving a rate adjustment within a very limited territory, with no such far-reaching consequences as the order now under review, has enhanced applicability to the present order of the Commission. "We would not be understood as saying that there do not lurk in this report phrases or sentences suggestive of a different meaning. One gains at places the impression that the Commission looked upon the proposed reduction [initiated by a carrier] as something more than a disruptive tendency . . . . The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. *Beaumont, S. L. & W. Ry. Co.* v. *United States*, 282 U. S. 74, 86; *Florida* v.

*United States,* 282 U. S. 194, 215. We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

Administrative experts no doubt have antennae not possessed by courts charged with reviewing their action. And so it may well be that to the expert feel the justifiable correction of an imbalance between Official Territory rates and the rates of other territories is a shift of 10% in the respective rates—Official Territory rates increased 10% and rates elsewhere decreased 10%. But courts, charged as they are with the review of the action of the Commission, ought not to be asked to sustain such a mathematical coincidence as a matter of unillumined faith in the conclusion of the experts.

I would reverse the decree and order the proceedings returned to the Interstate Commerce Commission.

MR. JUSTICE JACKSON, dissenting.

I find it impossible to agree with this extraordinary decision. I will discuss but one of its phases—that which is treated in subdivision Eighth of the Court's opinion. This holds that the Interstate Commerce Commission has, and rightfully has exercised, the power to add 10% to certain basic freight rates affecting the Northeastern part of the United States. This increase was not asked by the railroads, goes to the prosperous and the insolvent ones alike, and is not even claimed to be necessary to pay the cost of service and a fair return on the property used in rendering it. This additional assessment is in no sense compensation for handling the traffic which the railroads concede was adequately compensated before. It is really a surtax, see Brandeis, J., in *New England Divisions Case,* 261 U. S. 184, 196, added solely to increase shipping costs in the Northeastern part of the United States for the purpose of handicapping its economy and in order to make transportation cost as much there as it does in areas where there

is less traffic to divide the cost. The surcharge burdens the territory where fifty percent of the consuming population of the United States resides by adding an estimated $15,000,000 per year to its shipping bills. It adds that much to the revenues of the Northeastern railroads with no showing or finding that it is needed to meet costs of furnishing railroad service.

The most important reason advanced for sustaining this order is the claim that this surcharge is to cure a discrimination in favor of the Northeastern territory against the South and West. Briefly and generally, the discrimination is said to consist in this: Mile for mile, a higher average charge is made for transportation under the present classifications in the more sparsely settled areas of the South and West than is made in the denser traffic regions of the Northeast. Why, then, should not the alleged discrimination be removed by lowering the high rates of the South and West? The answer is that they cannot be reduced further than the ten percent already ordered in this proceeding, because the railroads of the South and West, in view of their costs, could not bear further decrease. So the only other way of equalizing the rates and making it as costly to move goods there as anywhere in the United States, is to make the shippers in the Northeastern territory pay the railroads this additional 10% which they have not asked and do not need.

The Court's approval of this order is based on an entirely new theory of "discrimination." It has never before been thought to be an unlawful discrimination to charge more for a service which it cost more to render. Discrimination heretofore has been found to exist only when an unequal charge was exacted for a like service, or vice versa. But now it is held to be an unlawful discrimination if railroads of the Northeast do not make the same charge as other railroads in the South or West, for a different transportation under different cost conditions.

The Government frankly advocates this new concept of discrimination as necessary to some redistribution of population in relation to resources that will reshape the nation's social, economic and perhaps its political life more nearly to its heart's desire. It says in its brief to us:

"There is no direct relation between the distribution of natural resources and the distribution of population in the United States. It happens that some of the areas richest in natural resources in the United States are sparsely populated. If the raw materials making up those natural resources are to be converted into finished products in that vicinity, allowing the area some economic benefit from their conversion, it will be necessary to transport considerable volumes of finished goods for long distances. Necessarily minerals are obtained where the deposits occur, and agricultural products must be produced in areas of suitable soil and climate. It is the task of the transportation system to carry commodities from points of production to consuming centers throughout the United States and to the ports for export. The more freely and cheaply the products are carried, the more competition there will be, the more production there will be, and the better will our transportation system serve our national economy.

The maintenance of a sound national economy requires the proper use of natural resources to insure reasonable economic opportunity of a stable nature for the people in each of the regions of the country. As indicated, population distribution is not in accord with the distribution of natural resources, and it would require many years for people to move to where these resources are, assuming it possible to induce such millions to migrate, or that it would be wise policy to do so even if possible. There are also areas of one-crop agriculture in which the people face read-

justments to restore and protect the land and to obtain additional sources of livelihood.

In view of all this, one of the basic principles in making freight rates should be the elimination of rate barriers against regional development, not to change our economy, but to remove discriminatory conditions which unfairly and unlawfully prevent the possibility of change."

The Court's entire discussion of the discrimination feature of this case is an acceptance of the Government's position without which the last support for this order would fail.

No authority can be found in any Act of Congress for the imposition of this surcharge on the Northeast solely to penalize it for being able to transport goods cheaper due to its density of population and volume of traffic. The policy of Congress remains as it long has stood: "adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service . . . ." Interstate Commerce Act, § 15a (2), 48 Stat. 220, 54 Stat. 912, 49 U. S. C. § 15a (2). Congress has never intimated, much less declared, a purpose to deprive the territory in which fifty percent of the nation's consumers reside of the benefit of this policy. The Ramspeck resolution did no more than to direct the Commission's attention to earnest complaints that the South and West were being mistreated in the matter of rail rates, and very properly to direct that they determine such complaints on their merits. True, in 1940 the provision prohibiting undue prejudice and preference was amended by the addition of "region, district, territory," to the list of persons or things not to be unduly prejudiced or preferred. Transportation Act, 1940, § 5 (a), 54 Stat. 902, 49 U. S. C. § 3 (1). But the Act already prohibited undue prejudice or preference to any "locality" and it is conceded that

the 1940 Act made no change in the substantive law of discrimination. Senator Wheeler, Chairman of the Interstate Commerce Committee of the Senate, showed clearly that while it would "make toward the equalization of rates," 84 Cong. Rec. 6072, it was not intended to accomplish what is here attempted. The following colloquy occurred:

"MR. FRAZIER. Is it the expectation of the committee that by the amendment in section 52 [now section 5 (b) of the Act] the rates in the various classification territories will be equalized or made the same in different territories?

"MR. WHEELER. I do not think that is possible.

"MR. FRAZIER. I do not see how it is possible. I was wondering what the intention was.

"MR. WHEELER. It is not possible for a number of reasons. For example, it costs more to carry freight over the mountains in two trains than to carry it on the plains in one train. Likewise, we must recognize the fact that railroad transportation service and rates depend somewhat on the intensity of the traffic. In long stretches of territory with no traffic, shippers must pay more for railroad service than do shippers in a densely settled part of the country where traffic is plentiful and where there is much competition from busses, trucks, and things of that kind. However, it seems to me from my study of the question that apparent inequalities ought to be corrected. . . .

"MR. FRAZIER. In North Dakota we have a large volume of wheat to transport in the fall of the year, and because we have that large volume, and because our territory is practically level, we have a rather beneficial rate on wheat as compared with some other territories. Our railroad commission and traffic experts are afraid that the provision to which reference

has been made will take that special rate away from us.

"MR. WHEELER. I believe this provision will help the people of the Senator's State rather than harm them in many respects.

"MR. FRAZIER. We have a much lower rate than prevails in many other sections of the country. If rates are to be equalized, it will mean raising our rates.

"MR. WHEELER. The bill does not mean that rates are to be equalized. . . . The people of the Senator's State might just as well disabuse their minds of the fear that as a result of the bill they will lose any benefit which they now have. . . ." (84 Cong. Rec. 5890.)

The Court never before has confided to any regulatory body the reshaping of our national economy. In *Texas & Pacific R. Co.* v. *United States,* 289 U. S. 627, the following statement of the law was made: "A tariff published for the purpose of destroying a market or building up one, of diverting traffic from a particular place to the injury of that place, or in aid of some other, is unlawful; and obviously, what the carrier may not lawfully do, the Commission may not compel." 289 U. S. at 637. See also *Southern Pacific Co.* v. *I. C. C.,* 219 U. S. 433; *I. C. C.* v. *Diffenbaugh,* 222 U. S. 42, 46; *United States* v. *Illinois Central R. Co.,* 263 U. S. 515, 524.

The Interstate Commerce Commission also accepted this as the law. In *Stoves, Ranges, Boilers, etc.,* 182 I. C. C. 59, the majority said, "It is not within our power to equalize natural disadvantages of locations," 182 I. C. C. at 68, and Commissioner Eastman was even more explicit, saying, 182 I. C. C. at 74:

"However, it is undeniable, I think, that in the past both southern manufacturers and southern car-

riers have shown a tendency to demand that the rates to the North be equalized in level with those within the North, on the ground that such equalization is commercially essential to the southern industries. It is a sufficient answer to say that it is not our province to equalize commercial conditions. However, the evidence in this case has served a useful purpose in making it quite clear that the southern manufacturers have certain advantages over their northern rivals, so far as operating and overhead costs are concerned, which would have to be taken into consideration if it were our duty to equalize commercial conditions through an adjustment of freight rates."

The Court shrouds this simple legal issue as to whether there is power to levy this surtax on the Northeast, in elaborate discussions of the evils of existing freight classifications and affirmations of the Commission's power to correct them. Neither of these propositions have ever been in doubt. But what importance can the Commission's power over classifications have in testing validity of this order? To correct classification was the asserted object of this proceeding, but that power has not been exercised at all. Not one classification is changed. Instead, a flat boost is made against traffic in the Northeast and a flat reduction for traffic in the South and West is ordered, leaving every inequality, discrimination, injustice or illegality in classifications just where the Commission found them. If there is proof of specific discrimination, injustice and illegalities in this case, why are they not now ordered corrected? If there is not sufficient proof of any specific discrimination, how can we hold that there is a general discrimination so extensive as to warrant this levy on the Northeast to correct them?

Perhaps the most incomprehensible of the Court's grounds for sustaining this order is that we do not have

here a "revenue problem." It is admitted that the North-eastern rates before increase are not proved nor found by the Commission to be noncompensatory to the railroads, or otherwise to threaten harmful effects upon the revenues and transportation efficiency of the carriers who get the increase. It also is admitted that the absence of such proof and findings might be fatal to this increased rate, for "If this were a case of determining whether existing rates passed below the lowest or above the highest reaches of reasonableness, the point might be well taken." Can the label affixed to a proceeding make legal what under another label would be invalid? Because the proceeding professes to correct classifications, a purpose now long and indefinitely deferred, may it be used incidentally to raise the rates of the whole Northeastern territory without any showing of need therefor? Whether we call the case a "revenue case" or something else, and whether we decline to denominate the problem a "revenue problem" and style it something else, the *order* under review is a *revenue order* and nothing else. It adds 10% to the revenues of the Northeastern roads from traffic moving under the rates in question; it knocks 10% off from the Southern and Western traffic under them. It exacts for the railroads added revenues; it lays on shippers the burden of providing those added revenues. This order admittedly might be invalid if the increased revenue were given to the railroads because they had made a claim to need it, and had only the present evidence and findings to support an allowance of their claim. So the conclusion is that the order is valid only because the railroads have no revenue problem and have not made a case entitling them to increased revenue. That is all I can get from the answer that it is a valid order only because "we do not have here such a revenue problem."

I long have heard the complaint that freight rates discriminated against the South. I have been inclined to suspect it to be true and have hoped to see an impartial and exhaustive study and decision on the subject. But this case does not meet that description. The student of economics will be puzzled at the Court's citation of the fact that the average employed person in the South earns only half as much as those in the Northeast as being in some way attributable to these freight rates. And the student of the judicial process will find instruction in the contrast between today's decision and that of *Interstate Commerce Commission* v. *Mechling,* 330 U. S. 567, in its regard for inherent advantages, in its attitude to "unsifted" averages as a basis for raising rates and in its deference to the administrative expertise of the Interstate Commerce Commission.

I am not unaware of the difficult position in which the Interstate Commerce Commission finds itself in cases of this character. Commissioner Eastman gave voice to it in dissent in *State of Alabama* v. *New York Central R. Co.,* 235 I. C. C. 255, 333, as follows:

> "The Commission is called upon to decide this case, on the record, after it has in effect been decided, in advance and without regard to the record, by many men in public life, of high and low degree, who have freely proclaimed their views on what they conceive to be the basic issues. Their thesis has been that the section of our country generally known as the South is our 'Economic Problem No. 1', because, among other things, it is low in industrial development, and that a major reason for this condition has been and is an unfair adjustment of freight rates which has favored the producers of the North and burdened those of the South. It has become a political issue. While, however, the South gave birth to

the issue, public representatives of the West now cry out against like supposed oppression, and public representatives of the North or East, as it is variously called, have risen in defense of their section.

"Under such conditions, it is not easy to decide the case without being influenced by emotional reactions, one way or the other, which should play no part in the decision."

But by administrative succession and judicial fiat the regulatory power of the Federal Government over commerce is now used to force a surtax on transportation of one section of the country admittedly not needed to compensate the railroad for the carriage but to take away from its inhabitants one of the advantages inherent in its density of population, regardless of the disadvantages which density of population also causes.

The observation of Commissioner Mahaffie in this case seems to me appropriate and accurate:

". . . In a country so vast as this with its widely varied resources and differing transportation needs it seems to me a mistake to try to compel general equality in rates except to the extent equality is justified by transportation conditions. I think the effort to do so must necessarily fail. But I am afraid the process of finding out whether it can be done will be painful and costly. The prejudice findings on which the new adjustment is largely predicated are calculated, if carried to a logical conclusion, to lead to a rigid rate structure based on mileage. While this may seem on its face to be equitable its accomplishment would entail radical industrial and agricultural readjustments. I doubt if the country should be required to incur the expense of making them." (262 I. C. C. at 708.)

Mr. Justice Frankfurter joins in this opinion.